Mary Ellen BARWACZ, individually, as parent and next friend of Jennifer Kulmacz, a minor, Plaintiff,

v.

MICHIGAN DEPARTMENT OF EDUCATION; Phillip E. Runkel, Superintendent of Public Instruction; Ed Birch, Director of Special Education for the State of Michigan; the Kent Intermediate School District; George Woons, Superintendent of Kent Intermediate School District; Northview Public Schools; and Paul C. Lemin, Superintendent of Northview Public Schools, Defendants.

No. G87–65.

United States District Court, W.D. Michigan.

March 22, 1988.

Gruel, Mills, Nims & Pylman by J. Clarke Nims, Grand Rapids, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen. by Paul J. Zimmer and Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for defendants Michigan Dept. of Educ., Runkel and Birch.

Day, Sawdey, Flaggert & Porter by William A. Hubble, Grand Rapids, Mich., for defendants Kent Intermediate School Dist., George Woons, Northview Public Schools and Paul C. Lemin.

## OPINION

ENSLEN, District Judge.

Jennifer Kulmacz is a fifteen year old handicapped student who is severely hearing impaired. Plaintiff Mary Ellen Barwacz brought this action pursuant to the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–20 ("EHA" or "EAHCA") following a decision by defendant Michigan Department of Education that the Individualized Education Program ("IEP") offered by defendant Northview Public Schools for the 1986–87 school year was appropriate for her special education needs. For a full account of the factual and procedural history of this case *see Barwacz v. Michigan Dept. of Educ.*, 674 F.Supp. 1296 (W.D.Mich.1987). Plaintiff seeks review of Warren C. Jahnke's state level decision of November 26, 1986 which affirmed the October 7, 1986 decision of the local hearing officer, Dr. Mange. Dr. Mange found that the Total Communication Program ("TCP") at Northview Public

Schools ("NPS") was an appropriate placement for Jennifer. Dr. Mange also found that the NPS placement would best develop Jennifer's maximum potential in the least restrictive environment ("LRE"). The LRE is commonly referred to as the mainstreaming requirement, or, put differently, the requirement that a student be placed in a non-segregated setting. Dr. Mange concluded that NPS had offered an appropriate placement for Jennifer, that plaintiff had rejected that placement, and that the school district had no responsibility to reimburse plaintiff for transportation expenses to and from the Model Secondary School for the Deaf ("MSSD"). Plaintiff seeks reimbursement for transportation expenses she incurred by unilaterally placing Jennifer at MSSD. Defendants argue that they have no obligation to reimburse plaintiff for those expenses because the program developed for Jennifer at NPS was appropriate under the provisions of EAHCA and the Michigan special education statutes.

Defendants do not challenge plaintiff's right to seek a judicial review of the administrative proceedings which occurred below. 20 U.S.C. § 1415(e)(2) directs that in reviewing an administrative decision under the EAHCA, "the court shall receive the records of the administrative proceeding, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

*The Administrative Findings*

Warren C. Jahnke, the state level reviewing officer, indicated that he made an independent review of the submitted material and adopted Dr. Charles V. Mange's findings of fact and conclusions of law. The Court has reviewed *in toto* the transcript of the October 7, 1986 hearing, the exhibits presented there, and the decision of Dr. Charles V. Mange. Evidence presented at the hearing included testimony by the following witnesses: Dr. Eugene Kyle, Regional Director of Special Education; Maurita Marr, Interpreter for Jennifer, NPS; Dan Duba, Jennifer's Seventh Grade Mathematics Teacher, 1985–86 school year;

Luann Sheridan, Coordinator of TCP, NPS; Martha Boutet, Teacher of Hearing Impaired and Jennifer's teacher, 1981–84; and Mary Ellen Barwacz, mother of Jennifer Kulmacz.

Numerous exhibits including the summary of the educational history of Jennifer, the Michigan School for the Deaf grade report, teacher evaluation forms, reading test results (April 1986) and a psychological report (April 1986) as well as a full IEPC report were also admitted. The hearing officer indicated that an IEPC meeting was convened May 22, 1986 for the purpose of the annual review of Jennifer's program. The report proposed the following:

1. Placement with teacher consultant services in the program for hearing impaired approximately 10% of the day.

2. Speech and language services for two thirty minute periods weekly.

3. "Social work/psych" services for two forty-five minute periods monthly.

4. Participation in regular education classes approximately 90% of the time with a certified interpreter. Classes specified were: English, mathematics, reading and social studies at the eighth grade level; science at the seventh grade level; physical education and "applied arts as deemed appropriate by the professional staff."

On May 28, 1986, Mrs. Barwacz signed the report indicating her disagreement with it and requested a hearing on the matters relating to the proposed placement.

The hearing officer correctly noted that the central issue is the degree to which the present program and the proposed program filled the requirements of Michigan and federal special education law. The officer found that the proposed program for Jennifer stated in the IEPC report of May 22, 1986 was one which offered the best opportunity for the development of Jennifer's maximum potential in the least restrictive environment as required under Michigan and federal law and regulations. In considering the quality of the program offered (see proposed IEP set forth above), the hearing officer emphasized Jennifer's ability to function—both academically and so-

cially—in the regular classroom with the interpreter service. In forming this conclusion, the officer relied on Jennifer's past academic grades, her vocabulary and comprehension scores, and on student evaluation forms completed by mathematics teacher Duba, English teacher Bolyard, art teacher Clapp, and mechanical drawing teacher Stuit. *See* Decision of Charles V. Mange dated October 7, 1986 at 6. The hearing officer conceded that there is some evidence of lesser achievement in the last half of the 1985–86 school year as demonstrated in the grades for mathematics and reading. In addition, Mr. Duba testified that the direct cause of lower grades was increased absence and missed assignments.

Plaintiff argued at the hearing that Jennifer's reading test scores, which indicate that she is functioning at the seventeen percentile for seventh graders on national norms, are "... overwhelming evidence ... that the school district is not providing her with an opportunity to maximize her potential." (T. at 16). The hearing officer concluded that "[i]n the presence of a life-long profound deafness which is commonly known to result in severe language deficits despite instruction, [plaintiff's] argument appears to lack sufficient substance when it is understood that this percentile score is based upon norms for the non-handicapped population." (T. at 93).

The hearing officer also initially considered the presumption of the superiority of a "model program," MSSD. After considering the apparent quality of the NPS program and the services proposed, as well as Jennifer's past achievements and her ability to function in the regular education environment, the officer concluded that that presumption was successfully rebutted by the proposed NPS program and would be invalid in Jennifer's situation. The officer noted further that there was strong evidence that the MSSD personnel did not sufficiently consider Jennifer's past demonstrated success in the regular environment as required by the federal LRE regulations. *See* Mange's decision at 7.

The hearing officer concluded that the NPS met the test of providing a quality program, that is, a program which would maximize Jennifer's potential in the least restrictive environment and that the evidence for plaintiff's view lacks support from professionals, exhibits or other data. The Court notes that the hearing officer observed that the LRE provisions were numerous but not absolute and that programs for more severely handicapped students may be housed in places other than schools with regular education programs. *Id.* at 5. Still, the officer rejected plaintiff's contention that the MSSD program, the program in which Jennifer is currently enrolled, is better designed to develop Jennifer's maximum potential in the least restrictive environment. *Id.* at 3. Because the hearing officer concluded that the record did not contain sufficient evidence "beyond a personal conviction to support the validity of [plaintiff's] position," the officer concluded that the NPS bore no obligation to provide or reimburse any expenses incurred by plaintiff for transportation arising out of the MSSD placement. *Id.*

*Evidence Presented at Trial*

In addition to the administrative hearing record, the parties also offered several witnesses to supplement that record. The additional evidence was offered by witnesses who did not appear at the earlier hearing. The Court believes that the evidence was noncumulative and did not change the character of the hearing from one of review to a trial *de novo*. *See e.g., Town of Burlington v. Department of Education*, 736 F.2d 773, 790–91 (1st Cir. 1984). Defendants contended at trial that the "additional evidence" provision of 20 U.S.C. § 1415(e)(2) should preclude Jennifer Kulmacz from testifying. Defendants argued that plaintiff chose not to present Jennifer as a witness at the administrative level and that to allow her to testify at trial would be unfair and would allow the character at the trial to change from one of judicial review to that of a trial *de novo*. Defendants argued further that the strategy or tactic of saving one's witness for trial is the type of behavior which the First Circuit in *Burlington* cautioned the district courts against when exercising their discretion in allowing "additional evidence."

Plaintiff responded that Jennifer did not testify at the original administrative hearing because at that time she was in her third week of school at MSSD, a new situation, and that plaintiff felt it would be in Jennifer's best interest to remain at school. The Court considered the totality of the circumstances surrounding Jennifer's failure to testify at the administrative hearing and concluded it would benefit from hearing Jennifer tell her own story. Accordingly, Jennifer was permitted to testify.

Jennifer testified as to the current extracurricular activities that she was engaged in at MSSD. She indicated that she is a member of the cafeteria council and a JV cheerleader. She also testified that in the previous year she had been a member of the swim team and a "pom-pom" girl. Jennifer compared and contrasted her experiences at MSSD with those she had while at NPS. She testified that while at NPS she always needed an interpreter and that the interpreter always followed her around so that she felt as if the interpreter were a "spy." In addition, Jennifer testified that she disliked having to always sit in the first row and that she felt "like a nerd." She also indicated that she had very few friends at NPS and would become frustrated with how slowly people "signed" when attempting to communicate with her. She also testified that she tried to become a member of the band at NPS but felt that the band leader ignored her and perhaps "didn't care." She indicated that the band leader did not know how to "sign" and that in general there was no interpreter available for her for after-school activities. She also indicated that classroom work became very tiring because there were always two people to look at when there was an interpreter involved. She also stated that at NPS teachers encouraged her to act like "hearing students." She stated that her grades dropped off at NPS because she "got fed up" and that the work "turned her off."

On cross-examination Jennifer testified that while she did communicate with "hearing kids" at NPS, it was hard to talk with them because they were so slow in "signing." Jennifer testified that she at times felt like "they" treated her "like a dog" at NPS and talked to her like she was "retarded." Jennifer also testified that it would have been a waste of time to ask for "more challenging work" at NPS. At MSSD, Jennifer asserted that she had developed approximately six friendships with "hearing students." Jennifer also stated that even though she only received "C's" at MSSD, the work was more stimulating and challenging there. She testified that she enjoys cheerleading, for example, and is generally happier at MSSD.

Dr. Kathleen M. Gabe, Ph.D., Special Education Consultant to the Dearborn Public Schools, Dearborn, Michigan, testified at some length concerning Jennifer's reading scores. She testified that when normed for hearing impaired students Jennifer is in the eighty-ninth (89) percentile. Dr. Gabe testified that she reviewed the 1986–87 IEP and also reviewed the exhibits presented at the local and state hearings, a transcript from the local hearing, and the copies of the IEP from 1979 until 1986. In addition, she indicated that she reviewed Jennifer's test scores and read Dr. Denton's transcript. She acknowledged, however, that she had not met Jennifer prior to the time of trial.

Dr. Gabe testified that in her opinion the IEP for 1986–87 was "appropriate." She noted that Jennifer would have been going into the eighth grade, that there was a 90% mainstreaming requirement, and that previously she had been mainstreamed 70% of the time. She noted that the reports indicated that Jennifer had friends and related well. She also noted that Jennifer had above-average passing grades and her conduct marks were also appropriate. She indicated that material was provided Jennifer which would allow her not just to learn to read, but rather to read to learn. She noted that in her opinion there was no need for a segregated school and that Jennifer should remain at NPS. Dr. Gabe concluded that even after listening to Jennifer testify it was her opinion that it was still in Jennifer's best interest to remain in public school. Dr. Gabe opined when hearing impaired students are placed in sheltered environments they fail to develop the same

skills they need to function in the "real world." She also testified that she felt that from listening to Jennifer that Jennifer had some oral speech skills. Dr. Gabe testified that in her opinion "mainstreaming" is preferable to segregated environments because it helps students to learn to cope.

Dr. Gabe testified that at the time the MSSD was conceived during the 1960s, the EAHCA had not been passed and that programming in public schools was mostly "oral." She emphasized that at that time public schools did not have a total communication program. Dr. Gabe testified that by the time MSSD became operational in the 1970s, total communication programs were already set up and running in the public schools.

Dr. Gabe opined that the NPS provided "more than the minimum." She emphasized that under the 1986–87 IEP, ten (10%) percent of Jennifer's day would be spent in special programs. In addition, she noted that NPS provided quality interpreters. She noted that there was a social worker who signed as well as a psychologist who knew how to sign. Further, NPS provided sign classes for hearing students. Dr. Gabe concluded that in her opinion the NPS 1986–87 IEP was designed to develop Jennifer's "maximum potential."

On cross-examination Dr. Gabe conceded that education includes more than simply academic skills. She testified that education includes psychological, psycho-motor, and social skills as well. She asserted that Jennifer could still develop social skills at NPS even though an interpreter would accompany Jennifer most of the day. Dr. Gabe also testified that there are no teachers who sign at NPS while all teachers at MSSD sign. Dr. Gabe also testified that in her opinion the NPS program would not prohibit Jennifer from going on to college if Jennifer so chose. It was Dr. Gabe's opinion that Jennifer's handicap was not so severe that she should be removed from NPS.

Because of illness, plaintiff's expert, Dr. David Denton, Superintendent of the Maryland School for the Deaf, was unable to attend the trial. The parties agreed that the November 20, 1987 deposition of Dr. Denton would be submitted in lieu of live testimony. The Court has reviewed that deposition and will make the following findings. Dr. Denton testified that his doctoral degree is actually an honorary degree given to him by Western Maryland College. Dr. Denton testified that he received a B.A. in Special Education from Lenoir Rhyne College. He also indicated that he received a Master's Degree from California State University in Northridge. Dr. Denton indicated that he has been Superintendent of the Maryland School for the Deaf for the past twenty years. Dr. Denton testified that he is familiar with MSSD and that it is in some sense a "competitor" of the Maryland School for the Deaf. Dr. Denton testified that in his opinion profoundly deaf students can benefit from mainstreaming provided a school for the deaf "support system" is already in place.

Dr. Denton's philosophy is a somewhat complex one which, in part at least, turns upon the notion that a "segregated community can provide a sense of anonymity to the hearing impaired student." The student is empowered in some sense and is enabled to choose a cultural definition rather than a pathological or clinical definition of deafness which is routinely imposed upon such students. Dr. Denton does not see his program as a restrictive one, but rather one that provides cultural, emotional and social experiences beyond those which such students are able to experience in traditional public schools. *See* Denton Dep. at 26–32. Dr. Denton testified that he is in favor of the total communication approach being used in public schools, but he understands total communication as something more than merely an "oral-manual issue." In Dr. Denton's view, total communication is essentially a human rights issue. *Id.* at 36–38.

Dr. Denton indicated that he had met for a brief time with Jennifer the day prior to his deposition. In addition, he also reviewed the documents presented at the lower-level administrative review hearings. Dr. Denton testified that he felt that a

comprehensive school for the deaf program would be appropriate for Jennifer. He also indicated that he was not familiar with the Michigan School for the Deaf but was under the impression that there were some budgetary difficulties in recent years and that they currently had new leadership. Dr. Denton testified that he could not really make a comparison between the Michigan School for the Deaf and the MSSD. He also indicated that his conversation with Jennifer left him with the impression that she felt the quality of instruction at the Michigan School for the Deaf was not as good as that which she currently is receiving at MSSD. *Id.* at 52. Dr. Denton also opined that Jennifer is able to now express feelings of frustration and anger at MSSD although she was unable to express them, or rather she suppressed them, at NPS because she was afraid that people would think those feelings existed and were being manifested because of her deafness. *Id.* at 55. Dr. Denton also opined that the NPS program as designed for Jennifer was possibly adequate but did not provide her with an opportunity for "self-fulfillment and cultural-psychological growth in addition to her academic skills." *Id.* at 63–64.

Dr. Denton concluded that he found the assignment of an interpreter 90% of the time to be "fundamentally inappropriate" but that the coursework and the educational goals were appropriate. *Id.* at 72. Dr. Denton emphasized that as a "paper goal" the rest of Jennifer's IEP was appropriate. However, he cautioned that an IEP is necessarily one-dimensional and has little to do with the quality of interactions of other human beings. *Id.* at 76.

Interestingly, Dr. Denton testified that he thought the administration at NPS probably did as much as it could do in devising an appropriate plan with special support services. *Id.* at 80. In Dr. Denton's view, there is nothing really "wrong" with NPS, but he suggests that what NPS offers is inadequate "to sustain the educational and emotional and cultural needs of a child with profound deafness." In Dr. Denton's view, a regional comprehensive program for the deaf in the public school system would provide the missing dimension that is cur-

rently not provided because of the overemphasis placed on the mainstreaming concept. In Dr. Denton's view, mainstreaming often, ironically, leads to the isolating of deaf children. While Dr. Denton applauds the use of interpreters in public schools, in Jennifer's case, at least, he finds that the use of an interpreter 90% of the day precludes opportunities for genuine personal interaction. What Dr. Denton finds detrimental to Jennifer's personal growth is the amount of time within a school day that she is "linked up with the world through a third party." *Id.* at 88. In Dr. Denton's opinion, MSSD provides a broader range of courses, more built-in support—including psychological and vocational counseling—as well as the varied and rich cultural opportunity on a university campus in Washington, D.C.

*The Standard*

The EAHCA provides a federal minimum standard for a "basic floor of educational benefits." The EAHCA incorporates by reference the Michigan standard requiring that the special education program maximize the potential of the handicapped person. *Cf. Burlington,* 736 F.2d 773, 789. Unfortunately, the relevant Michigan statutes do not define the phrase "maximum potential." As this Court has previously indicated, the Michigan Court of Appeals has noted *in dicta* that there is clearly some limitation as to what kind of program is required. *Nelson v. Southfield Public Schools,* 148 Mich.App. 389, 393, 384 N.W. 2d 423 (1986).

It is clear to the Court upon reviewing the provisions of the Michigan statutes and rules in conjunction with the EAHCA, that the applicable standard for schools in Michigan is that schools shall, to the maximum extent appropriate, provide special education programs and services that are designed to develop the maximum potential of each handicapped person within the least restrictive environment. Further, it is also clear that special classes, separate schooling, or other removal of handicapped children from the regular education environment should occur only when the nature or severity of the handicap is such that edu-

cation in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

■ Moreover, it appears that the Michigan School Code itself also places certain limits upon the board of a local school district in terms of the other agencies or entities that it may contract with to provide the special education programs and services. Accordingly, defendants argue that—given the state and federal mainstreaming requirements and the state geographical limitation on contracting for special education services—they could only recommend that plaintiff's daughter be removed from the regular educational environment to a separate school when the nature or severity of her handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Defendants argue further that even if plaintiff could be removed, her placement outside of the state of Michigan is limited geographically to that of an adjacent school district in a bordering state. *See* M.C.L.A. § 380.1751(1)(b). The Court is not completely convinced that this "geographical" limitation is necessarily as restrictive as defendants suggest, yet without engaging in some sort of "selective incorporation" and without the benefit of more guidance on the issue of maximum potential from the Michigan courts, it appears that Michigan has not intended to provide a model environment for the education of the handicapped. Nevertheless, it is clear to the Court that if no appropriate placement could be made within the geographical limitations imposed under Michigan law, that the geographical restriction would be inapplicable to the extent that it would contravene the basic requirements of the EAHCA.

Of course, the Court need only reach the issue regarding the geographical limitation of services in the context of a discussion of whether the MSSD is an appropriate interim placement by plaintiff for purposes of reimbursement for transportation expenses under the EAHCA if it first determined

that the IEP developed by defendants was inappropriate.

It is defendants' contention that the IEP developed by them for Jennifer Kulmacz for the 1986–87 school year was designed to develop her maximum potential within the least restrictive environment and that it was appropriate under the standards of both the Michigan School Code and the EAHCA. Defendants further argue that plaintiff's objection to the IEP proposed by them essentially rests upon the philosophical disagreement with mainstreaming rather than with the merits of the education Jennifer received while attending NPS.

Plaintiff, of course, argues that the NPS's IEP fails to maximize Jennifer's potential as a handicapped student. Plaintiff suggests that there is no evidence that the school made any genuine effort to seek placement for Jennifer in an academic setting outside the school district which would maximize her potential. Plaintiff argues further that MSSD is an appropriate placement for Jennifer, and one which serves to maximize her potential. Finally, plaintiff argues that this Court has the power under the EAHCA to grant such relief as it deems appropriate.

*Findings of Fact and Conclusions of Law*

■ Hearing Officer Charles V. Mange found that the 1986–87 IEP developed for Jennifer Kulmacz by NPS was the most appropriate program designed in the least restrictive environment to develop Jennifer to her maximum potential. The Court believes that it is clear that judicial review of the decision below should not amount to a trial *de novo. Cf. Colin K. by John K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983). Further, the district court is to make "bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Town of Burlington v. Department of Education,* 736 F.2d 773, 790–91 (1st Cir.1984). The First Circuit has noted that "[t]he court, in recognition of the expertise of the administrative agency, must consider the findings carefully and

endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *Id.*

Based on the preponderance of all the evidence presented before me, I make the following findings. I accept the hearing officer's finding that the direct causes of Jennifer's lowered grades in the last half of the 1985–86 school year were increased absenteeism, missed assignments and perhaps her anticipation of transferring to MSSD. The Court also accepts the hearing officer's finding that Jennifer's reading test scores which placed her in the 17th percentile for seventh graders based on national norms is not an indication that the school district has failed to design a program which would maximize Jennifer's potential because that score must be considered in the context of a life-long profound deafness which is commonly known to result in severe language deficits despite instruction.

Further, the Court also finds that the most recent Stanford Achievement Test administered to Jennifer on February 19, 1987—approximately six months after Jennifer began attending MSSD—indicates that Jennifer, when compared with other hearing impaired students, performed in the 83rd percentile in reading comprehension; 94th percentile in numbers; and 96th percentile in math computation.

Of course, neither the lowered academic performance in 1985, nor the reading test scores, tell the whole story. Plaintiff emphasizes, and defendants do not really dispute, that the emotional, social and academic aspects of Jennifer's life must be considered in addressing whether a program is designed to develop Jennifer's maximum potential. In fact, section two of the IEP evaluates cognitive, affective, and psychomotor skills. *Cf.* Transcript of Sept. 16, 1986 Hearing at 26. ("T. 26").

The Court notes that a report by Steven Braam, a psychologist working at NPS during the 1985–86 school year, was presented to the hearing officer. Mr. Braam indicated that he had worked with Jennifer in group and individual therapy programs during the 1985–86 school year. Mr. Braam's report indicated that the goal of group therapy was to increase a participant's knowledge and skills in dealing with issues and experience that adolescents commonly encounter: dating, substance abuse, relationships with parents, etc.—with special emphasis placed on the communication aspects of those issues which are most problematic to deaf people. Mr. Braam reported that he saw Jennifer as a well-adjusted person, and while he felt that NPS's mainstreaming program was adequate academically, he saw the MSSD program as an "enrichment program" which would give Jennifer a sufficient opportunity to develop leadership skills and social skills consistent with the deaf culture. *See* Psychologist Report of May 21, 1986.

Dr. Kyle, Ph.D., on the other hand, testified that in his opinion NPS provided an opportunity for Jennifer to develop leadership skills in that through social interactions at NPS she could actually help "educate" nonhandicapped students. (T. at 28).

Plaintiff maintains that her arguments do not turn on a philosophical disagreement with the concept of "mainstreaming." However, the Court believes that no matter in what terms plaintiff's argument is couched, it ultimately is grounded in and turns upon a discussion of the merits of mainstreaming versus placement in some sort of a "segregated setting." The testimony of plaintiff's expert supports that conclusion. Indeed, plaintiff's argument that MSSD is more appropriate because of the presence of hearing-impaired teachers and teachers that sign at MSSD ultimately turns on the notion that mainstreaming is inappropriate or to some extent ineffective. There are different philosophies of what a deaf person, or perhaps, more accurately, of what environment a profoundly deaf adolescent should be placed in in order to eventually "succeed" in the hearing community. The Court does not pretend to know the answer to the broad question of what type of social/academic environment is the most appropriate. Much of what

plaintiff's expert testified to concerning the necessity of the profoundly deaf to integrate into a separate, "deaf culture" in order to better find their way in the hearing world made sense. However, the Court cannot substitute its judgment for that of the local IEPC on that score.

In attempting to resolve this case, I have often felt as if I were in a "custody battle" —one in which both sides have a vested interest in seeing their personal "nurturing philosophy" validated. Indeed, at the local hearing plaintiff often argued as to what was in the "best interests" of Jennifer. "The best interest of the child," of course, is not the relevant legal standard here. Further, the Court's decision is complicated by the fact that both NPS and plaintiff Barwacz both appear to have Jennifer's best interests in mind—they simply disagree on the most appropriate way to reach the "same" ultimate goal.

The Court's inquiry is also handicapped by the fact that Michigan has not defined "maximum potential" but has clearly indicated that there are geographical as well as fiscal limits to its stated commitment to educate the handicapped to their maximum potential. The Michigan courts have made clear that maximum potential is in some sense only precatory in that it does not mean utopian, nor does it apparently mean the best education possible. If new empirical research clearly demonstrated the existence of certain pedagogical methods the application of which would provide a better education for the profoundly deaf than that which is currently offered via mainstreaming or the existing segregated communities, for example, but if such education were only available in Europe, the Court does not believe that Michigan would be required to send its handicapped students abroad. Further, again assuming the existence of some superior "foreign" instructional method, the Court does not believe that Michigan would necessarily be required to provide similar opportunities under the present statutes and case law interpretations of those statutes. It may certainly be wise policy to do so, and this Court would applaud efforts directed towards achieving those ends. However,

those policy aims are the proper province of the State legislature and not of this Court. The Court further notes that defendants' expert conceded that Massachusetts does bus certain of its students to the MSSD, but it appears to the Court that the Massachusetts statutes and case law allow —perhaps mandate—that state of affairs.

The Court concedes that the fact that the federal government has indicated a preference for mainstreaming, and, at the same time, has created a "model school" for the profoundly deaf which is not founded upon the principles of mainstreaming is somewhat perplexing from a policy perspective. Still, the recent legislative history indicates that "applying provisions ... of the Education of the Handicapped School for the Deaf, the Committee intends to make it clear that the students enrolled in these programs have individualized education programs developed by the local education agency and that placement in these programs has been determined by the local team to be the least restrictive placement for each student." S.Rep. No. 290, 99th Cong., 2d Sess. 8, U.S.Code Cong. & Admin.News 1986, pp. 1790, 1797.

On the one hand, the Committee Report appears to indicate a preference that the *local education agency* make the initial decision to place a student in the MSSD. On the other hand, the Report also seems to suggest that a placement in the MSSD can be a "least restrictive placement." This acknowledgement that a "least restrictive environment" for a profoundly deaf student can be the MSSD—a "segregated community"—is consistent with the Committee's earlier perception that there have been "significant changes over the past ten years in the philosophy and practice of the education of all handicapped students since the passage of ... the Education for all Handicapped Children Act." *Id.*

■ There was testimony by Dr. Kyle, Ph.D., at the original hearing that indicated, that the decision not to place Jennifer in Washington in the Model Secondary School for the Deaf was, in part at least, based upon "geographical" considerations

as well as upon the perception that the MSSD program was not the least restrictive environment. As I have indicated above, it appears *that the MSSD should not be presumptively excluded from consideration as "a least restrictive environment" within the meaning of the EAHCA simply because the MSSD is not strictly speaking, a mainstreaming program.* However, I note that Dr. Kyle also testified that "[Jennifer's] maximum potential was best obtained by being in the hearing community as opposed to the deaf community. That's the way we anticipate Jenny spending her adult life." T. at 27. Again, it seems that the only way I can really arrive at a different conclusion based on all of the evidence presented to me is to assert a philosophical preference for the segregated community approach as it is currently practiced at MSSD.

It is clear that Jennifer had academic and social success in the past at NPS. It also appears to the Court that in the latter part of the 1985 school year Jennifer was going through—and judging from the early reports from MSSD, is still going through—a certain "spirited rebelliousness"—a state of consciousness not unknown to many adolescents, and a state sometimes manifested in adolescents with superior academic ability as well as in those with lesser skills. Jennifer's grades and reports at MSSD indicate that Jennifer must confront her behavioral problems in order to improve her academic performance. It may well be that MSSD will turn out to be "right" for Jennifer, that her grades will improve and that she will, if she so desires, go on to college. It may be that she would have eventually turned her declining academic performance around at NPS—had she chosen to remain there. There was testimony that excessive absenteeism and the anticipation of going to MSSD accounted for an academic performance that all seem to agree is below Jennifer's potential. Jennifer herself testified that in her opinion MSSD is "more challenging" and a "better school" than NPS. It is clear that at the present time Jennifer is a happier person at MSSD and appears to have some contacts with the hearing world at MSSD as well.

The question of what "type" of school is best suited for a particular child's temperament and/or abilities is a familiar one. On the collegiate level, experience demonstrates that some students do better in large universities while others perform better in small colleges. There are individual choices involved in school selection—different values, different priorities—and the difference in individual performances at the two different types of academic institutions previously mentioned cannot be attributed to the abstract superiority of one mode of instruction or social/academic environment over another—where "all things being equal" the only difference in the institutions is that one is "large" and the other, "small."

It may well be that if the Court were to substitute its judgment for that of the school board, it would choose to send Jennifer to the MSSD. Jennifer has certainly demonstrated to this Court, to use a contemporary metaphor, that she is in no sense "a child of a lesser god." Moreover, it is evident that her self-proclaimed "pride in her deafness" will help her attain whatever goals she may set for herself. However, under the limited type of review which the Supreme Court has indicated is appropriate here, I conclude that the plaintiff has not met her burden of proving that the IEP designed and approved by defendants fails to meet the requirements of the EAHCA—even allowing that the State standard which requires the board of education, intermediate school boards and local school districts to "provide special education programs and services designed to develop the maximum potential of each handicapped person" is incorporated into the EAHCA. The Court will enter a separate order granting judgment for the defendants and against plaintiff.