John FRENCH, Guardian and Next Friend of David French, a Minor, Plaintiff,

v.

OMAHA PUBLIC SCHOOLS, Nebraska School For the Deaf, and the Nebraska Department of Education, Defendants.

No. CV 90-0-416.

United States District Court, D. Nebraska.

May 1, 1991.

Mary P. ·Clarkson, Broom, Johnson, Fahey and Clarkson, Omaha, Neb., for plaintiff.

John P. Heil, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, Neb., for Omaha Public Schools.

Harold Mosher, Sr. Asst. Atty. Gen., Lincoln, Neb., for Nebraska School for the Deaf, and Nebraska Dept. of Educ.

## MEMORANDUM OPINION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD G. KOPF, United States Magistrate Judge.

John French (Mr. French), as guardian and next friend of his adopted son, David French (David), brings this action pursuant to the Education of the Handicapped Act (EHA), 20 U.S.C. § 1400, et seq. This action, particularly authorized by 20 U.S.C. § 1415, is brought to obtain review of the decision of the hearing officer, the Honorable W. Russell Bowie (hearing officer), retained by the Nebraska Department of Education (NDE) regarding the appropriate educational placement of David. In addition to NDE, also named as defendants are the Omaha Public Schools (OPS) and the Nebraska School for the Deaf (NSD).

The parties consented to try this case before me in my capacity as a United States Magistrate Judge, and the Honorable William G. Cambridge, United States District Judge, District of Nebraska, referred the matter to me for trial. The matter was submitted on March 11, 1991, after five days of trial, with the submission of proposed findings of fact and conclusions of law. Supplemental oral argument was heard by telephone conference call April 4, 1991. Pursuant to Federal Rule of Civil Procedure 52, I now set forth the court's findings of fact and conclusions of law in the form of this memorandum opinion.[1]

I find in favor of the defendants, and against the plaintiff, for the reasons set forth herein.

## I. STATEMENT OF THE CASE

### A.

In December, 1989, Mr. French filed a petition with NDE, later amended, naming OPS and NSD as respondents. NDE assigned the petition to the hearing officer to conduct a hearing and render a decision and order pursuant to Neb.Rev.Stat. § 79–3351 (Reissue 1987) and 20 U.S.C. § 1415. The dispute between Mr. French and OPS and NSD involved the appropriateness of the then-current Individual Education Plan (IEP) regarding David. Although David was a resident within the jurisdiction of OPS, he was being educated at NSD pursuant to a contract between NSD and OPS. Mr. French contended that David's placement at NSD was inappropriate and that he should be placed in a school with hearing children. Mr. French also challenged the adequacy of the IEP, claiming that it failed to provide a measurable starting point for analysis, that it failed to state cohesive, attainable, short-term goals and objectives, and that it failed to set forth realistic, objective criteria for deter-

---

1. Any finding of fact which is more properly considered a conclusion of law shall be so construed. Alternatively, any conclusion of law which is more appropriately considered as a finding of fact shall be so construed.

mining whether David had progressed toward those goals and objectives. At no time was NDE a party to the proceedings, except to the extent that it was the agency obligated to consider Mr. French's petition.

An evidentiary hearing was conducted before the hearing officer and on May 18, 1990, the hearing officer rendered his opinion (Exhibit 13, at 114–130).

The hearing officer believed there were two issues before him. The first issue was whether or not NSD, as opposed to the hearing-impaired classroom at the Washington School operated by OPS, was an appropriate placement for David. The second issue was whether the IEP developed by OPS was appropriate for David.

As to the first issue, the hearing officer concluded that given David's multiple handicapping conditions, his medically fragile condition, and his need for a self-contained classroom with physical therapy, David's placement at NSD was not inappropriate, but the decision on where to place David for the 1990–91 school year should be made after his new IEP was drafted, giving due weight to the suggestions of all of the team participants. Secondly, the hearing officer concluded that the IEP drafted by OPS was deficient in that it did not correctly and adequately state David's current level of development or educational performance and that it did not list appropriate objective criteria, evaluation procedures, and schedules for determining achievement of educational objectives. Accordingly, the hearing officer ordered OPS to develop an IEP for David for 1990–91, with objective and correct statements of his current educational capabilities, setting forth goals and objectives in a clear, unambiguous manner, with objective criteria for measuring David's progress, taking into account the active learning recommendations of the Boys Town National Institute

(BTNI), as well as parental input. The hearing officer further found that except for NSD's participation in the development of a new IEP for 1990–91, the claim against NSD should be dismissed.

## B.

In June, 1990, Mr. French, on behalf of David, filed suit in this court against OPS, NSD, and NDE, pursuant to the provisions of 20 U.S.C. § 1415(e)(2).[2] NSD filed a motion to dismiss, claiming that Mr. French's complaint failed to state a claim against NSD upon which relief could be granted and further claiming that as an instrumentality of the State of Nebraska, NSD is immune from suit under the Eleventh Amendment to the Constitution of the United States. NDE filed a motion to dismiss on essentially the same grounds, adding as a third ground that since this action was brought pursuant to 20 U.S.C. § 1415(e)(2) and since NDE was not a party to the administrative hearing, it was improperly joined as a defendant. The motions to dismiss were denied. NSD and NDE then filed answers and counterclaims, asserting, among other things, that the hearing officer's decision should be affirmed regarding placement, but reversed regarding the sufficiency of the IEP. OPS filed an answer and counterclaim. OPS requested that the decision of the hearing officer be affirmed regarding placement, and reversed regarding the sufficiency of the IEP.

## C.

A pretrial conference was held and the parties agreed that the following might be accepted by the court as established facts for purposes of this case only:

(1) Plaintiff John French is the parent and next friend of his 14–year old son, David French. David was born with a

---

**2.** That statute provides, in pertinent part, that any party aggrieved by a decision of a hearing officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

condition known as Kniest Syndrome, a form of dwarfism, with a profound bilateral hearing loss and malignant hyperthermia. Like many persons with profound deafness, David is unable to speak intelligibly and must rely on non-speech modes of communication. He also has a visual impairment and certain physical disabilities which affect his ambulation and impair his ability to use his hands for sign language and finger spelling. Plaintiff and his son reside in the Omaha Public School District in Omaha, Nebraska.

(2) Defendant Omaha Public Schools (hereinafter OPS) is a school district organized and operating pursuant to the laws of the State of Nebraska and constitutes a local educational agency as defined in 20 U.S.C. Section 1401(a)(8). It is required by law to provide special education to handicapped students and has received federal funds for the education of handicapped children pursuant to 20 U.S.C. Sections 1400 et seq. on the basis of assurances that it will comply with the requirements of federal statutes and regulations.

(3) Defendant Nebraska School for the Deaf (hereinafter NSD), is a school for the hearing impaired which serves hearing impaired and multi-handicapped students. NSD is financed by state and federal funds and is administered directly by Defendant Nebraska Department of Education (hereinafter NDE).

(4) Defendant NDE is the agency responsible for the supervision of elementary and secondary education in the State of Nebraska. NDE is responsible for employing and retaining hearing officers to conduct special education appeal hearings as required by Nebraska and federal law. NDE is a state educational agency as defined in 20 U.S.C. Section 1401(a)(7). It receives federal funds for the education of handicapped children pursuant to 20 U.S.C. Sections 1400 et seq. on the basis of assurances that it will ensure that local school districts comply with federal statutes and regulations.

(5) In 1987, David French was placed at NSD pursuant to an Individual Education Plan (hereinafter IEP) formulated by OPS and NSD staff and agreed to by Plaintiff. David has continued to be placed at NSD.

(6) On December 6, 1989, Plaintiff, pursuant to Title 92, Chapter 55 of the Nebraska Administrative Code, filed an appeal with NDE regarding the IEP and placement affecting his son.

(7) A hearing on said appeal was held on March 20, 21, 22 and April 2 and 6, 1990 before a hearing officer appointed by NDE, and a Final Decision and Order was issued by said hearing officer on May 18, 1990.

(8) This action was commenced on June 18, 1990 by the filing of a Complaint which was timely filed pursuant to 20 U.S.C. Sections 1400 et seq. This Court has jurisdiction under 28 U.S.C. Section 1343(3) and (4) and 20 U.S.C. Sections 1400 et seq.

Order on Pre-trial Conference ¶ C (Filing 39).

Thereafter, a five-day trial to the court commenced February 7, 1991. At the conclusion of the trial on February 11, 1991, the parties were given thirty days to submit proposed findings of fact and conclusions of law. I heard additional oral argument by telephone on April 4, 1991 regarding the question of whether Mr. French continued to desire placement of David at the Washington School, an elementary school, and, if so, whether, there were age-appropriate peers at that school. The trial testimony had focused on whether David should be placed at the Lewis & Clark Junior High School (Lewis & Clark), whereas the administrative hearing had focused on placement at the Washington School. Later Mr. French responded in writing, and stated that, despite the ambiguity in the record about whether there were age-appropriate peers at Washington School at the present time, he desired placement at Washington School, Lewis & Clark, or another "mainstream" OPS school suitable for David. OPS responded by providing a partial transcript of the trial record in apparent answer to the question of whether

there were age-appropriate peers at the Washington School.

The two issues to be resolved by the court are:

(1) Is David's current placement at NSD consistent with the "mainstreaming" requirements of 20 U.S.C. § 1412(5)? [3]

(2) Was the 1989–90 IEP deficient in terms of (a) failing to provide "a statement of the present levels of educational performance of such child," or (b) failing to state "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved," within the meaning of 20 U.S.C § 1401(a)(19)(A) and (E)? [4]

## II. FACTS

### A.

David is now fourteen years of age. He was born July 20, 1976. For about the first five years of his life, David lived in a home for the severely mentally retarded in Illinois, but around the age of three, because he was showing some signs of development, it was decided that he could be adopted. Mr. French adopted David in 1981, when David was four years and nine months old.

When Mr. French adopted David, he adopted a child with almost overwhelming disabilities.[5] David was born with a condition known as Kniest Syndrome, a form of dwarfism. Among other things, David suffered from severe to profound bilateral hearing loss. This meant David was un-able to hear and to speak intelligibly. David's primary handicap insofar as education is concerned is that his hearing impairment has substantially delayed[6] his ability to communicate with others, both in initiating communication and receiving communication from others. While David uses hearing aids, the aids apparently are of little help to David.

David's primary educational handicap may be described in lay terms as delayed language development. For example, when he was adopted by Mr. French, David could express only four words in sign language. This compares with hearing children of David's same chronological age who would customarily be expected to know at least several thousand words. Evidently David's early institutionalization coupled with his hearing impairment caused him to lack even the most rudimentary communication skills at the time he was adopted.

In addition to the educationally significant handicap described above, David has other handicaps which, to a lesser degree, impact his ability to initiate or receive communication. David has, for lack of a better word, "webbed" hands. This means it is very difficult to understand David's sign language because he cannot use his fingers to form the signs. Moreover, David suffers from a visual impairment. While this impairment is accommodated with glasses to some degree, David must be allowed to look at small objects over the top of his glasses and a tilt-top book holder or surface is very helpful to him when reading.

---

**3.** The Act provides that "to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5).

**4.** Among other things, the Act requires that an IEP contain "a statement of the present levels of educational performance of such child" and a statement of "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." 20 U.S.C. § 1401(a)(19)(A) and (E).

**5.** I recognize that some people believe terms like "disabled" should be replaced with more positive terms such as "differently abled." See B. Ehrenreich, Teach Diversity-with a Smile, Time, Vol. 137, No. 14, 84 (April 8, 1991). Suffice it to say that I mean no disrespect by the use of "disabled" or similar terms.

**6.** David is not mentally retarded. The estimates of David's intellectual ability range from low-average to high-average.

Still further, David has a problem with hand dexterity. While he can write, he writes very slowly. For all practical purposes, David cannot speak.

David has physical disabilities in addition to the handicaps which directly impact upon his ability to communicate. When he was small, David was unable to walk because of various orthopedic difficulties. After extensive surgery, David is now able to walk with the aid of crutches. According to Mr. French, David can walk from one to two miles and can also walk over rough terrain. Around home and on some smooth surfaces, David evidently can walk without crutches. David can generally negotiate ramps and hills if the slopes are gentle. He can walk upstairs if the stairs are uniform and of average depth and height.

David also suffers from a spinal condition known as odontoid hypoplasia which, as I understand it, means that David's head is not securely connected to his spinal column. If David were to suffer a significant blow from behind, or a significant flexion of his neck, he might experience severe neurological injury.

David's orthopedic specialist, Dr. Esposito, has not recommended against David's placement in a regular school environment. Dr. Esposito indicated it would be better for David if the hallways were clear when he attempted to negotiate stairs because he would have difficulty with other children trying to pass him. However, all this meant was that David would require "a little extra time or to be allowed to transit between classes when other children aren't in the hallway" (Exhibit 22; TR 25: 4–19). In this sense, David is no different from other children with handicaps treated by Dr. Esposito. Dr. Esposito was of the opinion that it would be an extremely unusual event for David to suffer a blow to his head at school significant enough to cause neurological injury. For example, flying balls would not pose a danger to David. Even if he were knocked down in the hallway, the risk to David would be from breaking a bone as opposed to any significant neurological injury.

If this were not enough, David also has pulmonary difficulties. His spine causes compression on his windpipe at the base of his neck, which in turn limits airflow and causes David to experience shortness of breath with exertion, such as during long walks. According to Dr. Mark C. Wilson, a specialist in pediatric pulmonology, David's pulmonary condition does not require any special consideration such as elevated humidity, avoidance of exposure to persons with respiratory infections, or special consideration regarding physical positioning.

David needs and benefits from physical therapy and occupational therapy which has in the past been delivered at school. Moreover, because of David's spinal condition he must watch his weight. It is advisable for a dietician to monitor David's food intake while at school so as to avoid "junk" food.

In terms of his overall disabilities, David is unusual for yet another reason. Very few children who suffer from Kniest Syndrome have survived as long as David. Thus, it is very difficult to give a prognosis for David.

The impression I have from the evidence is that David, now age 14, presents a unique set of interrelated problems for those who endeavor to educate him. According to OPS David presents the school system with most difficult language delay problem of any of hearing impaired child in the OPS system who is not mentally retarded.

### B.

Notwithstanding David's disabilities, the evidence is clear that Mr. French has required David to work hard to overcome his disabilities. As a result, Mr. French has also required much of the educators who have sought to teach David. As will be discussed more fully later, Mr. French's emphasis on David's overcoming his disabilities has led to tension between Mr. French and various educators. This pattern began to develop with Mr. French, David, and educators in Illinois.

After Mr. French adopted David, he wanted to begin David's education. Educators in Quincy, Illinois, recommended that David be placed in an institutional setting similar to the one he came from. Mr. French objected. Accordingly, David was placed in the Adams School in Quincy, Illinois. However, he was placed in a self-contained hearing-impaired classroom, which meant that all of the children in the classroom were hearing impaired.

The Adams School in Quincy, Illinois, was a regular school in the sense that the hearing-impaired classroom was part of a school that also educated nonhandicapped children. It is not clear from the record precisely how much contact David had with hearing children at the Adams School, but it is likely that he would have had at least some contact at lunch, at all-school meetings, and the like. It is clear that David was placed in a "self-contained" hearing-impaired classroom, meaning that virtually all of his educational instruction took place with other deaf students.

David stayed at the Adams School for approximately three years. He remained in the hearing-impaired classroom all three years, which Mr. French described as a "pre-school classroom for the hearing impaired" (Exhibit 17A; TR 13: 2–9). From a class picture it appears that all of David's fellow students were age appropriate or of about the same age as David.

It is not clear how David progressed at the Adams School. On the one hand, in order to stay in the preschool hearing-impaired classroom, David had to learn a given number of signs during the first ten weeks or be expelled. According to Mr. French, at the end of ten weeks David had learned several times the required number of signs. However, perhaps not too surprisingly, given David's handicaps, after three years in the preschool hearing-impaired classroom, David had only "developed some academic knowledge" (Exhibit 17A; TR 14: 25). This meant that David "did a lot of the pre-school curriculum there, learning colors, learning the alphabet, learning how to locate sounds with his hearing aids, learning to discriminate sounds" (Exhibit 17A; TR 15: 1–5). There is nothing in the record which gives any convincing evidence, in quantitative terms, as to where David was educationally when he began at the Adams School and where he was at the time he left the Adams School.

David was eight years old when his family moved to Minnesota in the fall of 1984. David was placed in kindergarten class for the hearing impaired at the Como School. The hearing-impaired kindergarten class at the Como School was similar to David's classroom at the Adams School in the sense that it was a self-contained classroom. As I understand it, the term "kindergarten" was used in an effort to describe the academic level of the students.

According to Mr. French, David seemed bored with the kindergarten class. As a consequence, Mr. French pressed the Como School for another placement. With the assistance of Dr. Susan Rose, an outside consultant who later appeared as an expert witness in the administrative hearing for Mr. French, David was placed in another hearing-impaired classroom taught by Mary Schultz, who also appeared as an expert witness for Mr. French in the administrative hearing. This placement occurred in January, 1986.

David was placed in a self-contained hearing-impaired classroom in the Como School which roughly paralleled a regular second-grade classroom in instructional difficulty. All of the children were hearing impaired. The other children were about the same age as David, between eight and ten years old. There were seven or eight children in the classroom, including David. During his time in Mary Schultz's classroom, David had opportunities to interact with nonhandicapped children in the lunchroom, during school assemblies, and the like. According to Dr. Rose, although she evidently did no testing to confirm her beliefs, David made substantial progress during his first month in Mary Schultz's classroom. After that period of time, Dr. Rose ceased to observe David.

Mr. French proposes that the hearing-impaired classroom at the Como School,

taught by Mary Schultz, is the proper prototype against which to measure David's progress, or lack thereof, at NSD. In other words, Mr. French believes that the hearing-impaired classroom at the Como School is a good example of how David should be taught. Among the reasons for Mr. French's feeling that Mary Schultz's classroom is a good example of how David should be taught is the progress Mr. French believes David made with Mary Schultz. Mr. French evidently attributes this supposed progress to David's opportunity to interact with hearing children.

I believe the facts indicate that while David made some progress in Mary Schultz's classroom, his progress was not nearly as dramatic as Mr. French suggests. David left Mary Schultz's classroom in May, 1987, when he was approximately ten years and ten months old. At that time, David was functioning at a level near the end of first grade when compared to the educational level of hearing students.

Mary Schultz evaluated David in May, 1987. In her opinion, David had made "outstanding progress" (Exhibit 1, Tab D at 36). However, she also concluded that David should "remain in a self-contained classroom with much 1–1 teaching, with some group work, with highly structured lessons and expectation" (Exhibit 1, Tab D at 36).

I found it useful to compare what David's teacher in the kindergarten class at the Como school said about David's progress with the progress Mary Schultz observed over the next two years. By doing so, I conclude that while David made some progress at the Como school, it certainly was not dramatic progress. More importantly, it is difficult to attribute his progress to a "mainstream" environment.

David's teacher in the kindergarten class at the Como School wrote in her yearly summary at the end of 1985:

> David has improved somewhat over the past year. He has worked in the 1st grade Math book and can add 1+number and get the correct answer. He's inconsistent with some of the more difficult problems. He has begun to use a Communication Board. He is offered both signing and the board as his means of communication. David has improved with spelling of words, color and number words.
>
> David needs consistent discipline—for example, giving him the choice of working now, playing later or if he doesn't work now, he doesn't play later. It is recommended that the elevator not be given as a reward for good behavior. Reading: Has completed Getting Ready to Read—didn't really understand situations Mathematics: MacMillan Math—Grade 1—completed Unit 7.

Exhibit 1, Tab D at 50.

Mary Schultz wrote at the end of the 1986 school year that David:

> [c]ame to my classroom January 1986. Deb Streeter served as a 1–1 tutor. The last 10 weeks of school, David spent much of the day with the entire class. He did well in that situation. Math—counts well, adds, subtracts − 10 well. Has begun to spontaneously sign a few words each day. Uses his communication board only as a last resort. It is very difficult to read David's signs. Does not interact with other students unless they initiate it. Wears personal aids well, Responds to sounds. Lipreads familiar language. Does not use speech at all. Behaves well—Assertive Discipline and Good Behavior Card for Home —Reading: Milestones—Red Book # 7 Mathematics: Hands on Math Manipulatives Needs someone to push him to be motivated.

Exhibit 1, Tab D at 51.

But by the end of the next year David's progress was problematical. In June, 1987, Mary Schultz wrote:

> David did not have a 1–1 tutor. He still needs lots of 1–1 teaching, but can function in a small group for a short time. He does not add to a discussion or volunteer in a group. David writes legibly. He signs to class members or to teacher and is understood much of the time—but every day there are things I don't get. He does not use the communication board. He asks how to spell words.

When asked to use more words, he can. David gets frustrated and resorts to banging his elbows at times. He responds well to strict discipline. Does well in Math. Knows facts, can borrow, carry, is learning to multiply. Can read, solve simple story problems. Greatly enjoys maps. Spontaneously talks to me about his daily, monthly schedule, physical well being & behavior daily. Doesn't communicate with peers unless they direct it. They like David a lot. Reading: Milestones Mathematics: 2nd Grade (workbook) Macmillian.

Exhibit 1, Tab D at 51.

### C.

Mr. French and David moved to Omaha, Nebraska, in the fall of 1987. Apparently looking at prior information, OPS officials concluded that David was generally functioning at a level near the end of first grade when compared to "mainstream" students, noting that in reading comprehension, for example, David's ability ranged from a kindergarten level to mid first-grade level, whereas his mastery of numbers concepts ranged from mid first-grade level to mid second-grade level.

In order to determine where best to place David, OPS and NSD spent thirty to forty-five days evaluating him for diagnostic purposes. During that time, various professionals analyzed whether David could be placed in a hearing-impaired classroom at the Washington School or whether it would be more appropriate to place him at NSD. With the agreement of Mr. French, school officials concluded that a permanent placement at NSD was appropriate. The rationale for placing David at NSD, as opposed to the hearing-impaired classroom at the Washington School, was to provide him with an all-signing environment throughout the day, thereby increasing his communicative ability while still providing the intense one-to-one level of instruction David evidently required.

In this regard, Ms. Hopkins, former OPS assistant supervisor for the acoustically handicapped program, explained that the Washington School would have been a more restrictive placement than NSD:

A. It was my opinion that Washington would be a more restrictive placement than Nebraska School for the Deaf.

Q. Can you explain what you mean by a more restrictive placement?

A. That David would be in contact with one classroom teacher who signed with whatever number students happened to be in that classroom for that year, whether it was five, two, six, seven, eight students in that classroom, that he might have occasion to see perhaps the other three teachers throughout that day and perhaps the other students of that day though the—

Q. The other what students?

A. The other hearing impaired students in that building which would amount to perhaps 20 people.

He would not have signing communication with anyone else in that particular school building and—

Q. Why is that?

A. Because they do not have fluent sign knowledge.

Q. In your—

A. The other teachers, the other students, the other adults of that facility are not fluent in sign language.

It was very important that he have an opportunity to develop social functional communication and that he had to use his language to make it that way. Therefore, he needs to continually be expressing this language so it's generalized and becomes a part of his base language, and in order for him to do that in a meaningful way, he had to do it with adults and students and individuals who knew sign language and, therefore, the greatest opportunity that would provide him the most—most optimal opportunities for this to happen was Nebraska School for the Deaf.

Q. Why is Nebraska School for the Deaf different than Washington School in that regard?

A. Nebraska School for the Deaf has an environment where everyone knows sign language.

Q. By everyone, you mean the students?

A. I mean the students, the teachers, the woman who work [*sic*] in the cafeteria, the engineers, the janitors, the librarian [*sic*], the secretaries, everyone knows sign language.

Q. What about the people that work in the dorm?

A. They know sign language as well.

Q. Did you believe David would have opportunities to communicate with non-handicapped students at Washington School if he were in the acoustically handicapped program there?

A. Minimally.

Q. Why do you say that?

A. David must be educated in a one-to-one setting. We would have to create that. It's not there.

Exhibit 18; TR 65: 6–25; 66: 1–25; 67: 1–16.

Ms. Hopkins testified that since David could not be "mainstreamed" into academic classes, but required virtual one-to-one instruction, he would at best have only a minimal opportunity to communicate with hearing students. Moreover, because he had very little ability to communicate with hearing individuals except by means of pad and pencil or some other device, there would be little educational benefit if David were placed at the Washington School for purposes of interaction with hearing students:

A. David would not be mainstreamed into classes for instruction because that is not appropriate for him. He might see hearing children in the hallway, going to a restroom or to get a drink of water. He might see hearing children at lunch. He might see children during an assembly. These opportunities would, in my opinion, be difficult for David to communicate in that you don't carry a note pad and a pencil with you when you go to lunch and when you go in the hallways; that when you are in an assembly, that you are not there with no [*sic*] pad and pencil, that the hearing children would not be fluent in sign, would not be familiar with David. David's sign language is very difficult to read and unless you are very skilled at reading signs, his—as obviously I'm not, because I have a very difficult time reading David, I think the interactions that he would have with that hearing population would be minimal.

Exhibit 18; TR 67: 25; 68: 1–19.

### D.

David began attending NSD. NSD is a state owned and operated school under the jurisdiction of NDE. It is located in Omaha, Nebraska. Its primary mission is to teach deaf children. Almost all of the staff and faculty at NSD, including custodians, nurses, and dieticians, are proficient in sign language. Each NSD teacher is appropriately licensed as required by law. NSD provides an aide to assist David in the classroom, to redirect his attention to the classroom teacher or to his desk work, and to assist him between classes and between buildings on the NSD campus. Although NSD has dormitory facilities, David lives with Mr. French. Other deaf students who attend NSD also live at home. A wheelchair is made available to David for transportation over longer distances on the NSD campus.

It is unclear from the evidence how many students were in David's class during his first year at NSD. During the time period covered by the administrative hearing (the 1988–89 school year and the 1989–90 school year), David was in a class with three other students. During the 1990–91 school year, there was only one other student in his class. Each student who was in class with David was age appropriate and had about the same language proficiency. Approximately fifty-seven deaf students attended NSD in 1990.

Because of Mr. French's work schedule he often finds it inconvenient to pick David up at the end of the school day. David is able to use the dormitory facilities at NSD until Mr. French arrives, and in the past David has used the extra time to work on improving his proficiency in keyboarding.

As might be expected all of the children at NDS are deaf and must use sign language. Some NSD students also have oth-

er disabilities. It is not clear how frequently, but, on occasion, hearing children are guests at NSD for extra-curricular activities such as athletic events and social activities.

David receives instruction from a variety of teachers. In other words, David is taught by different teachers for each academic subject. Every Thursday all of David's work is copied and given to an IEP coordinator. The IEP coordinator monitors compliance with the IEP and assists the classroom teachers in their planning for David. Most of his teachers are quite proficient in sign language and some of his teachers are themselves deaf.

There have been times when at least two of the teachers at NSD could not sign. On one occasion there was a long-term substitute who was unable to sign. On another occasion David's English teacher, Ms. Perkins, taught him although she was unable to sign. However, Ms. Perkins did understand sign language, and was learning to sign. On both occasions there were interpreters available for use by these teachers to assist them in their instruction. Presently at least five of David's teachers have master's degrees with endorsements in teaching disabled students.

### E.

During the first and second years of David's placement at NSD, Mr. French became increasingly concerned about David's progress. Among other things, Mr. French observed that David seemed much less enthusiastic about school than he was while enrolled in Mary Schultz's class at the Como School. Moreover, Mr. French was alarmed because his scrutiny of David's school papers had convinced him that David was doing work he had already mastered, and the papers seemed to Mr. French to reflect a style of education which was repetitive in nature and stressed rote learning as opposed to more active learning.

From the record, there seems to be no question that David's progress at NSD has been slow. However, it also appears that in some areas David is making significant progress. Some examples will help illustrate this point. Jill Ramsey, head teacher in the elementary school at NSD, who has a master's degree and is also a speech pathologist, testified that when David arrived at NSD from Minnesota he was using only a word or two and was not initiating conversations. More recently, however, David's communication with others has grown a great deal:

A. When he came to our school—how do I want to say this to make it clear? He was using a word or two. He was not initiating conversation with us. He was not initiating ideas. The ideas came from other professionals, children would begin to talk with him and he would not respond. He would ask—pardon me, someone would ask him what something meant and he would have this—this expression as if I don't understand but he would not give you any indication of where this was unclear

Of very recently, he has made a great deal of growth in A, initiating greetings with peers as well as adults. His—the number of words he puts together, signed or spoken, to communicate has increased a great deal. He is answering questions—he is answering questions, for instance, with a—why question with because so and so with several words. He also, if he does not know, it's taken a lot of work, but he is answering, I don't understand, I don't know, again, please, these kinds of things to aid in the communication between himself and a partner.

Exhibit 19; TR 41: 25; 42: 1–22.

Ms. Ramsey further testified that David frequently expresses emotion, which he had not done before, and often expresses that he is happy because of school:

Q. You talked earlier about expressing emotions. Has he improved or increased in his ability to express his emotions since and during the period of time you have worked with him?

A. Yes, definitely.

Q. Can you explain how?

A. We are specifically focused right now on various words which express emotion, excited, proud—oh, I'm at a loss

right now. Those are the two that come to my mind, because recently he did a wonderful job in a language lesson in remembering what had to happen and the speech was involved also, and I said, how do you feel about this good work that you did? And he signed and vocalized excited, proud, and those are words that I wasn't aware that he was utilizing spontaneously or even was aware of when he first came to NSD.

Q. Generally speaking, is David a happy child at NSD?

MRS. CLARKSON: Object to form.

MR. BOWIE: Overruled.

Q. Please answer.

A. He very much appears to be at school. Every morning, as I alluded earlier, with the opening exercises, the children, how do you feel they ask the teacher, the teacher asks them, how are you today. Well, I'm happy. Why are you happy? And this kind of thing, and David's response frequently is I am happy because school [sic], which leads me to believe that he is excited about the things he's doing.

Exhibit 19; TR 43: 13–25; 44: 1–18.

At this point, it is appropriate to interject that evaluating David's progress, or lack thereof, is an extremely difficult, and at times essentially subjective, endeavor. All of the parties to this litigation, and all of the experts, agree that standardized testing measurements, while useful, need to be looked at with some skepticism because the tests were not initially designed for deaf children and because David's disabilities make him an extremely difficult child to evaluate. Nevertheless, David's progress at NSD, when measured by objective testing standards, has been slow. For example, the most recent IEP, which is not challenged by OPS or Mr. French, indicates that after three years at NSD David was still at the kindergarten- to first-grade level for many language-based subjects (Exhibit 101).

However, David's progress at NSD is about the same as experienced in other schools according to Dr. Kellogg, the Assistant Commissioner of Education and Administrator at NSD:

Material on standardized tests has been sent by OPS to father. This material will show Mr. French that David has made more progress than he will admit. For example, he has improved in reading comprehension from a 1.0 level in Minnesota to a 1.7 grade level here. In math concepts he moved from 1.9 to 3.0. [sic] in less than one year. The boy has not improved in grade level (1.7 to 1.7) in word reading but that is an area in which multihandicapped deaf children seem to have deficiencies and an area in which gains are not easily seen. A gain of 1.7 in the 5.3 years he was in school prior to coming to Nebraska does not show that our problems are unique with this youngster.

Exhibit 1, Tab WW at 1–2.

Dr. Kellogg has a doctorate in education, and is certified in teaching the deaf. He converses with David in sign language two to three times a week.

Unfortunately, the relationship between NSD and Mr. French became increasingly stressed during this period of time. In one instance, Dr. Kellogg barred Mr. French from the school's campus without a pass "because his behavior is unpredictable" (Plaintiff's Exhibit 1, Tab WW at 2). Mr. French refused permission for David to participate in some NSD field trips and extracurricular activities such as cub scouts. Although NSD would provide transportation for David, Mr. French elected to transport David himself, evidently because David requires a special seat for safe transportation. NSD had offered to obtain the necessary seat. David was tardy eighty-seven out of ninety-six school days during the first semester of the 1990–91 school year. According to Mr. French, David was tardy because he did not want to go to school, whereas the defendants imply that Mr. French was the cause of David's tardiness. NSD staff have expressed a willingness to use ideas and materials suggested by Mr. French, but state that Mr. French has been uncooperative. Mr. French states that NSD staff has es-

sentially ignored his suggestions. The inescapable conclusion from the evidence is that Mr. French's dispute with NSD, a genuinely substantive dispute regarding placement, has at times deteriorated to the point where both Mr. French and the NSD staff have resorted to petty behavior.

### F.

In 1989 the difficulties between Mr. French and NSD and OPS led to an independent evaluation by the Boys Town National Institute (BTNI). In February, 1989, BTNI evaluated David at its center for childhood deafness. This was a multidisciplinary assessment including analysis of David's communication abilities, academic abilities, social abilities, and psychological status.

Evidently BTNI was not asked to express an opinion as to whether or not David should continue at NSD. Rather, BTNI's efforts were directed toward helping the interested parties assess David's present level of academic performance in order to suggest ways in which his performance might be improved.

BTNI made quite specific findings and recommendations in the areas of psychology, communication, and academics:

FINDINGS AND RECOMMENDATIONS:

Based on formal evaluation findings and informal observations, the following summary of results and recommendations was formulated by the evaluation team:

PSYCHOLOGY:

*Findings:*

1. David is functioning at least within the average range of non-verbal intellectual ability.
2. David had difficulty with details and cause and effect relationships.
3. His social communication skills were very limited.

*Recommendations:*

Based upon David's performance during this evaluation, it was suggested that he receive counseling to assist him in developing socially-appropriate behavior.

Since some of his social skills are directly related to his delayed language abilities, it was suggest [*sic*] that the social counseling sessions be integrated with language therapy from a language interventionist.

COMMUNICATION:

*Findings:*

1. David is functioning at an approximate 5–7 year range for knowledge of vocabulary and basic concepts.
2. David demonstrated relative strength in his knowledge of and his ability to converse about certain topics (i.e. travel; geography).
3. His social conversation was restricted in quality and and [*sic*] flexibility.
4. David tended to be a "responder" rather than an initiator of conversational interaction with most adults.

*Recommendations:*

1. Due to David's limited social conversational skills, it was suggested that he receive therapy in social/pragmatic communication skills.
2. Because of his significantly delayed language abilities, it was suggested that David have a language based curriculum.
3. David should be given the opportunity to learn keyboarding and computer word processing skills, that will aid his literate language use and may potentially augment communication.
4. It was further recommended that an augmentative communication evaluation should be conducted in the future.

ACADEMICS:

*Findings:*

1. David's academic abilities ranged between a late first grade and a third grade level.
2. David demonstrated a relative strength in math calculations.
3. Results on the language-based subject areas evaluated (reading, applied math, general knowledge) were significantly below average when compared to hearing students at his present grade level.
4. David's comprehension of information presented in written or spoken

language form was significantly below hearing peers at his functioning grade level. Very structured, familiar language needed to used [*sic*] for David to understand the majority of the linguistic information presented during these evaluation sessions.

*Recommendations:*

1. Based upon the results and observations of his performance during this evaluation, it is suggested that David would benefit most from a highly structured learning environment, that is language-based and and [*sic*] emphasizes active learning.

2. Because of the difficulty David had understanding spoken and written language, it is suggested that he would attend better and learn more with a one-to-one student-to-teacher ratio for language-based subjects and presentation of new information.

3. David [*sic*] performance suggested that he has rote memory for information and application of skills. To foster functional use of learned information, it is suggested that David be provided with opportunities for meaningful application of acquired skills.

4. To assist David with a fuller knowledge of learned information, it is suggested that his curriculum be integrated, with an emphasis on vocabulary and concept formation.

5. Given David's age and present level of language and learning abilities, it is suggested that he have a vocational evaluation in the future. Such an evaluation would assist him in preparing for the future.

Exhibit 1, Tab MM at 50–52.

### G.

The IEP which was at issue before the hearing officer was developed on September 29, 1989 (Exhibit 2, Tab U at 6). The IEP concluded that:

David would not benefit from regular educational programs for grade or age appropriate students because: (1) his receptive language and reading comprehension allow him only to function with students at the 5–7 year old level; (2) he can only follow 1– to 2–step directions; (3) David needs one to one instruction due to his poor attending skills even with benefit of an interpreter; and (4) he shows reduced effort and motivation when confronted with unfamiliar language or difficult tasks.

Exhibit 2, Tab U at 6.

Mr. French objected to the placement decision stated in the IEP. He did not, however, object to any of the other findings or statements of the IEP.

The IEP in this case is thirty-five pages long and largely single spaced. The participants in the IEP conference included Mr. French, Dr. Kellogg, NSD administrator, Ms. Ramsey, NSD speech and language pathologist, Ms. Minerich, classroom teacher of the hearing impaired, Dr. Hixson, OPS placement administrator, and Paula Hopkins, OPS supervisor of hearing-impaired programs. In addition to the input of the BTNI report, four of David's classroom teachers and a resource teacher for the hearing impaired provided additional information.

Approximately four pages of the IEP are devoted to David's then present level of academic performance. The IEP first describes efforts to measure David's intellectual ability by stating the scores of two IQ tests. The IEP then endeavors to describe David's general information fund level by detailing the results of two tests to measure educational achievement. The IEP goes on to describe what has been observed about David generally.

For example, the IEP states that David's sign language level may be described as "expressive signs are telegraphic with some three word correct syntax. Intelligibility of signs by adults in speech class– 15%, in Lunch by supervisor–5%" (Exhibit 2, Tab U at 8–9).

Following the statement of David's general performance levels are specific statements concerning David's communicative ability, language ability, reading ability, mathematic ability, science ability, social studies ability, occupational therapy situation, and physical therapy situation. In-

cluded in each of these categories is a description of David's performance which most often contains observations of David as well as his scores on various testing instruments.

For example, the IEP states that David has "manuscript and cursive writing skills," but his writing is "at slow speed", while his "letters are formed and produced correctly" (Exhibit 2, Tab U at 9). In the area of communication, the IEP endeavors to describe David's lip reading skills by referring to the "Craig Lipreading Inventory." In the area of language, the IEP describes both David's age equivalency to other students (5–6 year old age) and his grade equivalency to other students (first to second grade equivalent, but at only the first percentile in terms of language competence). The IEP then proceeds to describe David's present language performance skills in terms of beginning knowledge, vocabulary, analogies, antonyms and synonyms, and concept development. Similar examples could be given for the IEP's presentation of David's reading ability, mathematical ability, science ability, social studies ability, occupational therapy needs, and physical therapy needs in terms of the IEP's effort to describe David's level of performance at that time.

Insofar as listing objectives, evaluation procedures, and schedules for determining achievement of educational objectives, the IEP is quite detailed. This section of the IEP is twenty-three pages long and lists approximately eighty objectives. There are objectives for art, computers, language, math, physical education, reading, "pragmatics," science, social studies, auditory training, occupational therapy, and physical therapy.

For each objective there is a description of the person who is to implement the objective, a narrative description of the objective, a statement of what evaluation procedures will used, and a schedule for when those evaluation procedures will be implemented. A few examples will serve to illustrate how the IEP approaches this area.

One of the objectives for language was the following:

OBJECTIVE FOR: LANGUAGE IMPLEMENTED BY: CLASSROOM TEACHER

Given reading paragraph with three to ten specified events at second to third grade reading level, student will retell the content of the story, using key vocabulary cue list without teacher assistance (independently) at 80% accuracy.

EVALUATION PROCEDURE: Independently read paragraph and asked to retell story content of the ten events, given list of key vocabulary

EVALUATION SCHEDULE: Weekly

Exhibit 2, Tab U at 21.

As a further example, the IEP describes an objective for "pragmatics" this way:

OBJECTIVE FOR: PRAGMATICS IMPLEMENTED BY: SPEECH/LANGUAGE PATHOLOGIST

Student will demonstrate the ability to perform each of the following six language functions: requesting, discussion of effect, expression of need, initiation of communication, question asking, greetings, taking conversational turns and describing. When given a direction or when asked a question by the speech pathologist in speech class, student will use the correct language function with no prompt using voice and sign (fingerspelling) simultaneously at the 80% level on 9 of 10 occasions.

EVALUATION PROCEDURE: Based on observation and charting by speech pathologist

EVALUATION SCHEDULE: Monthly

PROGRESS:

Response 1. Student will request clarification, actions and objects

Response 2. Student will discuss his feelings using complete English sentences

Response 3. Student will initiate a conversation with the speech pathologist, paraprofessional and lunchroom supervisor and take three conversational turns

Response 4. Student will express his needs in speech class (Example: "I am thirsty.")

Response 5. Student will initiate and respond directly to greetings by adults and peers at school

Response 6. Student will describe an unknown object so that an adult can guess what it is

Exhibit 2, Tab U at 30.

## H.

Dr. Rose, an educational consultant who had previously assisted Mr. French at the Como School, testified at the administrative hearing as to her views that the IEP in this case was deficient. Dr. Rose has a good deal of experience with the development and implementation of IEP's.

Regarding the IEP statement of David's present level of performance, Dr. Rose particularly criticized: (1) the use of standardized tests because those tests had not been "normed" on deaf children; (2) some of the observational data because the data were too subjective; (3) some of the observations because they were unclear; and (4) some of the levels of performance because they seemed to be contradicted by the BTNI study. In terms of the portion of the IEP dealing with objectives, evaluation procedures, and schedules for determining achievement of educational objectives, Dr. Rose concluded, among other things, that: (1) some of the objectives did not comport with assessment data; (2) in some cases the objectives would be difficult to implement; and (3) in some cases the objectives are too difficult for David to master.

Interestingly, Dr. Rose testified that the IEP developed by the Como School (Exhibit 1, Tab D at 22–24) was deficient in many respects. As Dr. Rose put it, "I don't agree with it. I'm not saying that Como is right. I'm here to say what is right for David" (Exhibit 15; TR 102: 24–25; 103: 1). Indeed, even a cursory analysis of the IEP prepared by the Como School and au-

thored by Mary Schultz (Exhibit 1, Tab D at 22–24) reveals that it is quite limited and abbreviated when compared with the objectives section of the IEP prepared by OPS (Exhibit 2, Tab U at 16–40).[7]

Oddly enough, Dr. Rose seemed to suggest that there were no assessment data suggesting that David required virtually constant one-to-one instruction. Dr. Rose said she had not "seen anything to the contrary that he could get along without one-to-one [teaching]" (Exhibit 15; TR 86: 11). But Mary Schultz had recommended in May, 1987, that David "remain in a self-contained classroom with much 1–1 teaching, with some group work ..." (Exhibit 1, Tab D at 36). The extensive BTNI examination concluded that David would "attend better and learn more with a one-to-one student-to-teacher ratio for language-based subjects and presentation of new information" (Exhibit 1, Tab MM at 52). Apparently Dr. Rose's criticism is not that David does not require extensive one-to-one instruction, but rather that David does not require "continuous" one-to-one instruction. If this is the criticism, the distinction that Dr. Rose seeks to make is not clear from the record.

Mary Schultz, David's classroom teacher at the Como school, also testified at the administrative hearing, and seconded many of Dr. Rose's opinions. Mary Schultz testified that David's social interaction and language interaction skills would improve if he were in a more integrated setting with more types of children, including hearing children. On cross-examination, she admitted that when David left the Como school to come to Nebraska, he was not meeting the curriculum goals for his grade level, with the exception of math.

Mr. French testified at both the administrative hearing and the trial of this case. Mr. French doubted whether David was receiving educational benefit from placement at NSD, particularly because of the

7. Parenthetically, Dr. Rose would not testify about the learning environment which existed at NSD and she would not express an opinion about whether David was receiving educational benefit at NSD. As Dr. Rose put it, "That's very,

very difficult for me to say because I didn't see the program. And I'm not there to evaluate. I can't make a real judgment." (Exhibit 15; TR 151: 22–24).

segregated environment. Mr. French explained the numerous trips and other activities he and David have participated in, and also explained that David is able to communicate with hearing people with his assistance. Indeed, the BTNI evaluation noted that "David's father greatly facilitated the interaction [with the BTNI evaluator]" and the "father has developed strategies that are facilitative to David's conversational interactions" (Exhibit 1, Tab MM at 3). Nevertheless, the BTNI study noted that even with Mr. French's help David did not often ask questions, request clarifications, discuss his likes and dislikes in detail, or initiate conversations. David's responses to greetings or other social conversational interactions were frequently inconsistent.

Mary Pat Moeller, coordinator of the BTNI study, testified at the administrative hearing. She testified that "educators could learn a lot from observing the father and son interact" because the father has "a very, very good way of reading David and knowing how to draw optimum performance from him by asking questions in the appropriate manner" (Exhibit 20; TR 31:15–20).

Ms. Moeller also testified that if one wants to communicate with David in a way that "is meaningful to him, you need to use sign to do that" and thus it was important for David to be with people who sign, whether or not they are deaf (Exhibit 20; TR 63: 22–25; 64: 1–7). Ms. Moeller felt that to promote the goals of educating David, he would have "more of a chance of interacting with other signing children" than hearing children, but "it's hard to generalize" because some "hearing children will take the time that's required to learn to sign and interact with David" (Exhibit 20; TR 63: 6–15).

Paula Hopkins, who was assistant supervisor of programs for the hearing impaired for OPS, testified at the administrative hearing and at trial. Ms. Hopkins is trained as a speech and language patholo-gist. Because David had such a severe language delay, she believed he needed to be at NSD because of its all signing environment and because NSD could provide one-to-one instruction.

## I.

Much of the testimony presented during trial of this case in this court—as opposed to the evidence presented to the hearing officer regarding the Washington Elementary School—dealt with the propriety of placing David at Lewis & Clark Junior High School. I had the firm impression that Mr. French wanted placement at Lewis & Clark because there was more of a chance for David to come into contact with age-appropriate peers, both deaf and hearing. Indeed the present IEP, developed after the hearing officer's ruling, stipulated that David's placement should be with "age appropriate peers" (Exhibit 101). This IEP has not been challenged.

It is therefore appropriate to discuss in some detail the facts surrounding Mr. French's proposal that David be placed at Lewis & Clark. It is also helpful to state some of the facts pertinent to a possible placement at the Washington School, since that is what the hearing officer examined and Mr. French evidently would accept placement at Washington School.[8]

As a general matter the difference between Washington School and Lewis & Clark insofar as David is concerned is quite simple. David is fourteen years of age, with an language ability of a child between ages five and seven. At Lewis & Clark there are age-appropriate deaf peers, but their language abilities are far superior to David's. At Washington School there are deaf children who function at David's language level, but instead of being age-appropriate, those students are of kindergarten age. There are age-appropriate hearing peers at Lewis & Clark, but no age-appropriate hearing peers at Washington School.

8. Mr. French stated in a letter to the court from his counsel that, "If the choice is between segregation at NSD and placement at Washington School where there may not be an exact match with age peers and language level peers, he would still choose Washington School." Letter of April 22, 1991.

The parties presented no evidence about the hearing impaired program at the Washington School for the 1990–91 school year and beyond. For previous years, the evidence revealed that Washington School maintained a hearing impaired classroom for kindergarten through third grade students, as well as offering hearing impaired assistance to children in grades four through six. Although it is not entirely clear, it appears that the kindergarten through third grade hearing-impaired program is distinct from hearing-impaired programs for the higher grades at Washington School. All of the deaf students were "mainstreamed" in at least some classes during each day. While there might have been a deaf child in the sixth grade room who might have been as old as fourteen or fifteen years of age, this child was not in the kindergarten through third grade hearing-impaired program. There is no evidence of any child at Washington School who was at or near David's age and who also had David's level of language development. Paula Hopkins believed that if David were to attend the Washington School's self-contained hearing-impaired classroom for kindergarten through third graders he would have to remain there for the entire school day.

Lewis & Clark Junior High School has an enrollment of approximately nine hundred students. The hearing-impaired students who presently attend Lewis & Clark all have language abilities superior to David's (ranging from a low of fourth-grade language ability to a high of twelfth-grade language ability), and all of the students in the hearing-impaired classroom are mainstreamed for at least some of their academic course work. Lewis & Clark presently employs one teacher for the deaf students and one interpreter.

Paula Hopkins worked for OPS from 1974 through 1990 and was assistant supervisor for the hearing-impaired program at OPS. She testified that there was a vast difference in language ability between David and the other deaf students at Lewis & Clark. Ms. Hopkins testified that the curriculum employed at Lewis & Clark was at the junior high school level. As Ms. Hopkins indicated, all of the students in the hearing-impaired class at Lewis & Clark have language abilities ranging from about a fourth-grade level to the twelfth grade or above. All of the students have social communication skills, meaning that they can, and do, initiate conversations with others. All of the students can narrate a story and all of the students take at least some of their academic work in "mainstream" courses.

On the other hand, David lacks social communication skills, has a language ability of somewhere between kindergarten and first grade, is not able to, or does not often, initiate communication with his peers, is unable to narrate a story to any significant degree, and would not be able to take any academic courses in the mainstream, with the possible exception of art. It is the belief of OPS that because David does not attend well without virtual one-to-one instruction, the use of an interpreter in a mainstream class is ruled out.

There are currently between five and eight hearing-impaired students at Lewis & Clark. Lewis & Clark does not have any hearing-impaired students within one to two years of David's chronological age who function at his level of language ability.

The cost to OPS for hiring a qualified teacher to instruct David at Lewis & Clark would be approximately $32,000.00. OPS could not use the teacher presently working at Lewis & Clark because of David's need for virtual one-to-one instruction, particularly given the difference between David's language ability and that of the other deaf students at the junior high school. In addition, there are presently no classrooms available at Lewis & Clark in which to teach David and, as a result, OPS would have to spend approximately $35,-000.00 to erect a portable classroom at the school so as to free a classroom in the main building for David's instruction. On the other hand, the cost to OPS for David's placement at NSD is approximately $4,000.00 per year. It costs approximately $55,000.00 per year to educate a student at NSD in terms of the amount of money the

State of Nebraska spends per pupil at NSD.

### J.

Assuming that some of the hearing students at Lewis & Clark or Washington School knew and understood sign language, it is undisputed that it is very hard for David to communicate using sign language because of the physical deformities of his "webbed" hands. It is quite difficult for people who have no experience communicating with David in sign language to understand his signs. As a consequence, David's ability to communicate with hearing peers, even those who might understand sign language, would likely be limited to the utilization of "augmentative communication devices."

As I understand it, an "augmentative communication device" can mean anything from a pencil to a computer. It is any device which aids or augments communication. In this case, it is undisputed that David prefers writing to other more sophisticated communication devices. However, it can take David quite a long time to communicate in this fashion. An augmentative communication specialist found that on average it required approximately 25.5 seconds per word for David to communicate. David has some keyboarding skills, although the deformities of his hands make it somewhat difficult for him to use a keyboard. He has some experience using a "TDD" device which, as I understand it, is similar to a computer and shows each communication on a digital display after it has been typed into the device. David also could be fitted with a book of sorts, hung about his head, which he could use to communicate with others by pointing to the frequently used words and phrases printed in the book. For example, if David wanted to go the rest room, the words "rest room" could be printed in the book and David could point to the words in order to get his message across.

### III. LAW

Before turning to the two issues which confront the court, it is necessary to understand the standard of review which this court must employ. 20 U.S.C. § 1415 provides in pertinent part that a court reviewing an appeal from a due process hearing "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and *basing its decision on the preponderance of the evidence* shall grant such relief as the court determines is appropriate" (emphasis supplied). The Supreme Court has said that this section is by no means an invitation to substitute the court's notion of sound educational policy for the conclusion of the school authorities:

Thus the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational

program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (footnotes omitted).

### A.

The first issue that must be addressed is whether or not David's placement at NSD is consistent with the "mainstreaming" requirement of 20 U.S.C. § 1412(5) which requires that "to the maximum extent appropriate" David should be "educated with children who are not handicapped" and that David should not be placed in separate schooling unless "the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." [9]

█ It is generally agreed that the so-called "mainstreaming" requirement of the EHA has three exceptions. *See Roncker On Behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).[10] The first exception is where mainstreaming would not benefit the handicapped child, the second exception is where any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly [11] be provided in the non-segregated setting, and the third exception is where the handicapped child is a disruptive force in a non-segregated setting. *Id.* The first two exceptions set forth in *Roncker* may be applicable in this case, while the third is not.

Before I address the applicable *Roncker* exceptions, I think it helpful to review a case which is, in many respects, similar to the one presented here. *See Barwacz v. Michigan Department of Education*, 681 F.Supp. 427, 434–37 (W.D.Mich.1988) (holding that specialized school for the deaf was not presumptively excluded from consideration as a "least restrictive environment" within the meaning of the EHA; but also holding that profoundly deaf student failed to show that the IEP, which provided for placement in a regular school setting, failed to maximize student's potential, thus concluding that school district had no obligation under the EHA to reimburse student's mother for costs of educating the child at the specialized school for the deaf).

The judge in *Barwacz* refused to adopt a "philosophical preference for one type of school setting over another." *Id.* at 437. On the one hand, the judge acknowledged that education in a specialized school for the deaf is not presumptively excluded from consideration as a "least restrictive environment" within the meaning of the EHA simply because the school for the deaf is not, strictly speaking, a mainstream program. *Id.* The judge found this to be true since the legislative history seemed to suggest that placement of a profoundly deaf student in a school for the deaf was consistent with significant changes which had been taking place in the educational community. *Id.* at 436 (citing S.Rep. No. 290, 99th Cong., 2d Sess. 8, U.S.Code Cong. & Admin.News 1986, 1790, at 1797). On the other hand, the court recognized that the EHA has indicated a preference for "mainstreaming." *Id.*

The judge in *Barwacz* concluded that he could not substitute his judgment for that of the local educational community. In so

---

**9.** In addressing the placement issue first, I assume, as I later find, that the IEP complied with the procedural requirements of the EHA. *See Rowley*, 458 U.S. at 205–207 & n. 27, 102 S.Ct. at 3050–3051 & n. 27.

**10.** Our circuit has adopted the *Roncker* analysis. *A.W. by and through N.W. v. Northwest R–1 School District*, 813 F.2d 158, 163 (8th Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987).

**11.** Subsumed within this exception is the fact that "[c]ost is a proper factor to consider since excessive spending on one handicapped child deprives other handicapped children.... Cost is no defense, however, if the school has failed to use its funds to provide a proper continuum of alternative placements for handicapped children." *Id.* at 1063.

doing, the judge continued placement at a "mainstream" school. The judge did so even though the child's test scores placed her in the seventeenth (17th) percentile of her fellow students while she was being educated in a "mainstream" school. The judge noted that the progress of a profoundly deaf student must always be judged "in the context of a lifelong profound deafness which is commonly known to result in severe language deficits despite instruction." *Id.* at 435.

■ In some ways, this case is the "flip side" of *Barwacz.* In this case, the advocate for the deaf child promotes a philosophical preference for placement in a regular school setting, whereas in *Barwacz* the advocate for the deaf child asserted a philosophical preference for placement in a school for the deaf. In this case, the advocate for the deaf child asserts that the child's low performance scores are attributable to the child not being placed in a regular school setting, whereas in *Barwacz* the advocate for the deaf child asserted that the low test scores were attributable to the deaf child's placement in a regular school setting. In this case, I shall not substitute my judgment for that of the drafters of the IEP that David can best be educated at a school for the deaf. And, similarly, the court in *Barwacz* concluded that it would not substitute its judgment for that of the drafters of the IEP that the deaf student could best be educated in a regular school.

Following the example of the court in *Barwacz,* I have endeavored to approach the placement decision in this case by avoiding "philosophical preferences", giving appropriate, but not undue, deference

to local IEP drafters, and recognizing that each deaf student is unique.

1.

As to the first *Roncker* exception, the issue of whether or not David would receive any benefit [12] from "mainstreaming," I conclude by the preponderance of the evidence that David would receive no benefit from mainstreaming.

It is extremely important to recognize that no one in this case believes David can be "mainstreamed" in the sense that he could take any significant portion of his class work in the company of hearing children.[13] Thus, Mr. French's position is not one of advocating that David should be educated with hearing children, by the use of "supplementary aids and services" as suggested in 20 U.S.C. § 1412(5). It is virtually undisputed that for all his academic class work David will require instruction in a self-contained hearing-impaired classroom. Thus, the concept of "mainstreaming" which Mr. French urges upon OPS is one where, for all practical purposes, David's interactions with hearing children and adults would take place when passing in the halls, eating in the lunchroom, or otherwise associating with hearing people at such events as assemblies or convocations. It is therefore appropriate to concentrate on whether David would receive benefit from these incidental contacts.

It is undisputed that David prefers to interact with adults and seldom initiates conversations even with deaf peers. In the proposed findings of fact and conclusions of law urged by Mr. French, it is alleged as a matter of fact that:

**12.** I pause to consider what the *Roncker* court meant when it made an exception for situations where the child would receive no benefit from "mainstreaming." Obviously, the EHA states a preference for "mainstreaming." However, this preference does not mean that in each case mainstreaming provides a "benefit" to the handicapped child. If "mainstreaming" always provided a benefit to the handicapped child, the exception provided by *Roncker* would not exist. Moreover, as the court indicated in *Barwacz,* schools for the deaf are not presumptively excluded under the EHA, even though such schools are not, strictly speaking, mainstream

programs. *Barwacz,* 681 F.Supp. at 437. Thus, I believe that when the *Roncker* court spoke of "benefit", it meant "educationally significant benefit." But, in order to be consistent with EHA "mainstreaming" requirements, I have assumed, without deciding, that the defendants have the burden of proof on this point.

**13.** As *Roncker* notes, the EHA's mainstreaming requirements apply to non-academic activities such as lunch, gym, recess, and transportation to and from school. *Roncker,* 700 F.2d at 1063 n. 6 (citing 34 C.F.R. § 300.553).

In 1986 and 1987, Mary Schultz recorded that David preferred to initiate interactions only with familiar adults and not with peers.... BTNI noted this preference as to familiar adults, even a deaf adult fluent in sign.... In October and November, 1990, [the augmentative communication analyst] observed David at NSD and noted that his non-hearing peers infrequently communicated with him: only eight instances were observed during the five days of data collection over a two month period. David initiated fourteen times. He initiated communication with adults 156 times.... At trial, Paula Hopkins testified her observations of David's preference to communicate with adults vs. peers was the same when she started as David's case supervisor in the Fall of 1988 as that reported by [the augmentative communication analyst] in the Fall of 1990.

Proposed Findings of Fact and Conclusions of Law by Plaintiff at ¶ 28, 11–12.

As the director of the BTNI study concluded, in order to have a "meaningful" communication with David, the communication must be based on sign:

> The basis of David's comprehension of language is through sign, and if you want to communicate with him in a way that is meaningful to him, you need to use sign to do that, so for him to have really substantive interactions with people, they need to be through communication [by] sign.

Exhibit 20; TR 64: 1–7.

As Ms. Hopkins testified, because David has very little ability to communicate at all, by whatever means, there would be scant educational benefit if he were placed in a regular school for purposes of interaction with students:

> A. David would not be mainstreamed into classes for instruction because that is not appropriate for him. He might see hearing children in the hallway, going to a restroom or go get a drink of water. He might see hearing children at lunch. He might see children during an assembly. These opportunities would, in my opinion, be difficult for David to communicate in that you don't carry a note pad and a pencil with you when you go to lunch and when you go in the hallways; that when you are in an assembly, that you are not there with no [sic] pad and pencil, that the hearing children would not be fluent in sign, would not be familiar with David. David's sign language is very difficult to read and unless you are very skilled at reading signs, his—as obviously I'm not, because I have a very difficult time reading David, I think the interactions that he would have with that hearing population would be minimal.

Exhibit 18; TR 67: 25; 68: 1–19.

To put it bluntly, but not unkindly, David can barely communicate using his primary medium of expression, sign language. How can he be expected to communicate with hearing peers, many of whom could not understand sign language? Moreover, when David does wish to communicate, more often than not, it is with adults rather than peers. There is simply no convincing reason to conclude that he would have "meaningful" communicative interaction with hearing people in halls, in gym, at lunch, or at assemblies.

Mr. French argues passionately that the foregoing analysis totally discounts David's favorable experiences at the Como School, where he interacted with hearing people, and that this analysis ignores Mr. French's testimony regarding David's successful communication with the hearing world, both with strangers and with family members. Mr. French also argues that this analysis ignores opportunities for augmented communication through the use of paper and pencil, various computer-like devices, and a book of commonly used expressions worn about David's neck. I wish to address each of these points in turn.

Mr. French argues that to conclude that David would receive no benefit from mainstreaming is to ignore David's worthwhile experience at the Como School where, at least during lunches and other nonacademic occasions, he was "mainstreamed." There is a twofold difficulty with Mr. French's reliance upon David's experience at the Como School.

Initially, it must be observed that there are no hard data, aside from the impressionistic testimony of Mr. French, David's teacher, Mary Schultz, and Dr. Rose, that David received any benefit whatsoever from his contacts with hearing children at the Como School. David attended the Como School for approximately three years, the first year in a kindergarten class and the remaining two years in Mary Schultz's second grade class. After he had been at the Como School for about three years, Mary Schultz concluded that David did not "communicate with peers unless they direct[ed] it" (Exhibit 1, Tab D at 51). It does not seem to me that his experience in the so-called "mainstream" environment at the Como School can be said to have benefited David's ability to interact with hearing children when, after three years, he would still not "communicate with peers unless they direct[ed] it" (Exhibit 1, Tab D at 51).

Still further, it must be remembered that David had "mainstream" experiences not only at the Como School but also at the Adams School in Quincy, Illinois. Between the Adams School in Illinois and the Como School in Minnesota David had approximately six years of incidental opportunities to interact with hearing children. As best that can be determined, after about six years of hybrid "mainstream" experience, David's language equivalency level was such that when he arrived at NSD in Omaha, Nebraska, he was only "using a word or two. He was not initiating conversations with us. He was not initiating ideas.... [C]hildren would begin to talk with him and he would not respond" (Testimony of Jill Ramsey, head teacher in the elementary school at NSD, Exhibit 19; TR 41: 25; 42: 1–22).

In summary, it seems to me that if David made progress at the Como School, particularly in Mary Schultz's classroom, that progress was a result of the gifted teaching of Ms. Schultz. However, his progress, such as it was, provides no credible predicate for the conclusion that David would benefit from the incidental mainstreaming which might occur during lunch, in the halls, in the gymnasium, and at school assemblies.

Next, Mr. French argues that any finding that David would not benefit from contact with hearing people in a regular school setting is contradicted by Mr. French's own experiences with David. The record is clear that Mr. French is able to motivate David and that he has taken David various places and exposed him to a variety of situations, many of which involved some interaction with hearing individuals. For example, I note Mr. French's touching testimony about his travels to Florida with David to visit with the publisher of a road atlas. According to Mr. French's testimony, David is able to interact with hearing people and receives valuable educational information by virtue of such interaction.

While I do not doubt that Mr. French has made a variety of educational experiences in the hearing world available to David, and while I do not doubt that David has received educational benefit from Mr. French's assistance, the fact of the matter is that Mr. French does not have day-to-day responsibility for David's public school education. Mr. French will not be with David during the school day when he has incidental contact with hearing children in the hallway, at the lunch table, and in the gymnasium or auditorium. If David has had successful and educationally significant experiences with hearing people in the presence of Mr. French, I attribute that success to Mr. French. Mr. French may have been able to structure David's interaction with the hearing world in ways which were sensible and meaningful to David and David may well have received significant educational benefit from Mr. French's intervention. However, Mr. French will not be available to structure David's interaction in the "mainstream" that would exist for David in the hallways, lunch rooms, gymnasiums, or auditoriums of OPS. NSD and OPS are not required, and cannot reasonably be expected, to replicate the extraordinary skills Mr. French has developed to teach David. *Rowley*, 458 U.S. at 198–200, 102 S.Ct. at 3046–3048 (holding that the EHA does not require a school to maximize the potential of each handicapped

child commensurate with the opportunity provided nonhandicapped children).

Mr. French also argues that the conclusion that David receives no benefit from mainstreaming ignores the significance of augmentative communication devices. I do not doubt that there are augmentative communication devices, including pencil and paper, computer-like devices, and books containing expressions David could point to, which would enable David to communicate with hearing people, at least to some degree, even if those hearing people do not understand sign language. However, the availability of these devices suggests only that it is technically possible for David to have some minimal communication with hearing individuals who do not understand sign language.

The availability of these devices does not suggest that David would want to use them to communicate with the hearing population, or that he could do so in a meaningful fashion. The evidence is undisputed that David's most effective communication device is sign language, yet he has extreme difficulty communicating in sign language with people who know sign language but are unfamiliar with David. The evidence further reveals that David does not like to initiate conversations with his peers, preferring instead to communicate with adults. I do not believe there is persuasive evidence in the record that the mere existence of augmentative communication devices can support the conclusion that David would have meaningful communication with his hearing peers, particularly given his severe language delay.

**14.** In so finding, I also find that David receives educational benefit at NSD, and that the IEP at issue was reasonably calculated to lead to educational benefit. *Rowley,* 458 U.S. at 206–207, 102 S.Ct. at 3050–3051 (footnotes omitted); *Roncker,* 700 F.2d at 1062. While David's academic progress has been slow at NSD, his progress everywhere has been slow. Indeed David's "score[s] must be considered in the context of a life-long profound deafness which is commonly know to result in severe language deficits despite instruction." *Barwacz,* 681 F.Supp. at 435 (emphasis supplied). Moreover, given the fact that David had virtually no chance to learn language until he was almost five years old due to his institutionalization,

Even assuming that David could and would use augmentative communication devices efficiently, one would still be left with a person having the language proficiency of a child of five or six years endeavoring to communicate with a hearing peer possessed of much greater language proficiency. In effect this case presents a situation in which a child with a language level of five to seven years would be trying to achieve educationally significant interaction with hearing peers whose language proficiency might be equal to their chronological age of fourteen years or greater. I think it quite unlikely David would benefit from such communicative interaction, even assuming that the augmentative communication device would permit it to occur in the first place.

In summary, I conclude that David should not be "mainstreamed," as proposed by Mr. French, because he would receive no benefit[14] from mainstreaming.

**2.**

Next, I shall consider the second exception proposed by *Roncker* having to do with whether the marginal benefits received from mainstreaming, if any, are outweighed by the benefits gained from services which could not feasibly be provided in the nonsegregated setting. For purposes of this exception, I will assume, although I think it doubtful for the reasons indicated above, that David would receive some marginal benefit from having incidental contact with hearing peers in the hallways, lunchroom, gymnasium, and auditorium at Lewis & Clark.[15] I assume that

David's overall progress, while slow, seems remarkable.

**15.** I do not find that the Washington School would be a proper placement. The parties presented no evidence about the present configuration—including student mix—of the hearing-impaired program at that elementary school. What the record does indicate regarding the Washington School in years past is that David would have virtually no contact with either hearing peers or deaf peers at the Washington School. To the maximum extent reasonably possible, David needs to have an opportunity for a grade placement with age-appropriate peers as indicated by the most recent IEP (Exhibit 101). That IEP is not challenged.

benefit would be the qualitative benefit asserted by Mr. French, which I understand to be the stimulation David would derive from associating with hearing and deaf children of his own chronological age.

If this be so, then I must determine whether or not it is "feasible" to provide David with continuous one-to-one instruction at Lewis & Clark and whether or not it is "feasible" to provide David with an all-signing environment at Lewis & Clark. It is my understanding that OPS contends NSD provides two things which OPS cannot "feasibly" supply: continuous one-to-one instruction and an all-signing environment. I turn now to those points.

OPS argues that David is in need of continuous one-to-one instruction. I must determine whether David does in reality need continuous one-to-one instruction as suggested by OPS and, if so, whether OPS can feasibly provide such instruction at Lewis & Clark.

I think it virtually undeniable that David requires one-to-one instruction on a more or less continuous basis. Indeed, Mary Schultz indicated David required "much 1–1 teaching, with some group work" (Exhibit 1, Tab D at 36). BTNI concluded that David would "attend better and learn more with one-to-one student-to-teacher ratio for language-based subjects and presentation of new information" (Exhibit 1, Tab MM at 52). While David has some ability to interact with other deaf children who are of similar chronological age and who have similar language delays, as indicated by Mary Schultz at the Como School, this group learning was only possible for "a short time" (Exhibit 1, Tab D at 51). According to BTNI, David requires a "language-based curriculum" and needs a "one-to-one student-teacher ratio for language-based subjects" (Exhibit 1, Tab M at 50–52).

It is undisputed that NSD can provide David with one-to-one instruction and furnish him an opportunity, however limited, to interact with at least one other student who is of the same or similar chronological age and has the same or similar language delay problems. Assuming that one-to-one instruction is generally required, that when it is not generally required group interactions can take place for only short periods of time, and that such opportunities are available to David at NSD, the question becomes whether OPS can feasibly provide those services at Lewis & Clark.

According to the testimony of OPS officials, if David were placed in the hearing-impaired classroom at Lewis & Clark, OPS would have to hire a teacher to teach David exclusively and buy a classroom to make up for the classroom that would have to be dedicated to David. The new teacher and new classroom would be required because the present hearing-impaired students are all mainstreamed for at least some of their academic work during each day, and they all significantly exceed David's language abilities. Thus, it would be impossible, according to OPS, to teach David at his language development level in a hearing-impaired classroom of chronological peers at Lewis & Clark because the other students would also require some attention from the teacher; because David requires much one-to-one instruction; and because the teacher would be teaching at significantly different levels of language between David and his chronological peers in the hearing-impaired classroom.

It will be recalled that David's language equivalency is somewhere in the kindergarten to first grade range, whereas the lowest functioning student at Lewis & Clark has a language equivalency in the third to fourth grade range. As I understand Ms. Hopkins, there is a significant difference between the way a teacher teaches a child of David's language equivalency compared to teaching children with a language equivalency of third grade or above. I asked Ms. Hopkins the following question and she gave me the following answer in this regard:

> Q. Never having taught, you'll forgive this question: Is there that much of a difference between, say, kindergarten and third grade in terms of the teacher's —the way in which he or she prepares to convey information to a child?

A. There really is; the language is very much different. The concepts and the abstraction is [*sic*] much different. There's even a larger jump between third grade and fourth grade, because it really moves into more abstraction and much more complex language, so it's a very big jump from primary to even intermediate, let alone intermediate to junior high, it's a bigger jump, and the language gap as the children get older gets much broader, and when you're in primary—when you're in kindergarten, what you don't know doesn't stick out so bad until you do hit second grade, third grade, and then when you—your vocabulary isn't as large and your understanding of all the nuances and all the concepts isn't there, that makes their ability to read and understand and complete and progress in academic work gets much bigger [*sic*]. It's kind of a vicious circle; you need language in order to learn language.

Partial Transcript of Proceedings Regarding Paula Hopkins; TR 57: 19–25; 58: 1–18.

In this connection, it must be recognized that David's language delay is unlike other deaf children in its severity. According to Ms. Hopkins, David's language delay is "severe," and she has "never seen a child that has been so language-delayed at his chronological age" (Partial Transcript of Proceedings Regarding Paula Hopkins; TR 128: 7–16).

I therefore conclude that in order for David to receive the type of instruction he would need at Lewis & Clark the present hearing-impaired teacher would have to either teach David, essentially ignoring his or her other students, or teach the other students, essentially ignoring David. The language differences between David and his age-appropriate peers in the hearing-impaired classroom at Lewis & Clark are simply too great to expect one teacher to deal with such a span of language abilities. This would mean OPS would have to hire another teacher, essentially to teach David alone. It would cost OPS approximately $32,000.00 a year to hire a new teacher. Moreover, because OPS does not have any other available classrooms at Lewis & Clark, OPS would have to purchase a portable classroom at a cost of approximately $35,000.00, transfer some students to the portable classroom, and use an existing classroom for David. Thus, the initial cost to OPS of educating David at Lewis & Clark would be about $67,000.00.

This compares with approximately $4,000.00 OPS pays NSD to educate David presently.[16] I think it plain, therefore, that the relative cost to OPS of educating David at Lewis & Clark would involve such excessive spending on David as to have the potential of depriving other handicapped children of OPS's scarce revenues. *Roncker*, 700 F.2d at 1063. David can receive one-to-one instruction in a class with at least one age-appropriate peer having similar language abilities in a school containing other age-appropriate peers at a cost of $4,000.00 to OPS, whereas to obtain similar services at Lewis & Clark OPS would have to spend about $67,000.00. This leads me to conclude that it is not "feasible" for OPS to provide services equivalent to those already provided by NSD.[17]

**16.** I acknowledge that the State of Nebraska also spends approximately $55,000.00 per year per pupil to educate a student at NSD. Even if I were to consider this sum, it would still cost approximately $59,000.00 to educate David at NSD, whereas OPS would have to spend approximately $67,000.00 to educate David at Lewis & Clark. More to the point, I think it inappropriate to consider the State's contribution to NSD in any sort of cost analysis. To my mind, the pertinent question is whether or not it is feasible for the entity required to provide the education to provide it in a "mainstream" setting. It is OPS which has the legal obligation to educate David. Therefore, it is appropriate to concentrate solely on the relative cost to OPS.

**17.** In making this determination, I find that, generally speaking, OPS has used its funds to provide a proper continuum of alternative placements for deaf children, and I do not understand Mr. French to contend otherwise. *See Roncker*, 700 F.2d at 1063 ("cost is no defense, however, if the school district has failed to use its funds to provide a proper continuum of alternative placements for handicapped children"). The evidence fully supports the conclusion that OPS operates a variety of programs for different levels of deaf children in an effort to

I turn next to OPS's contention that even if there are marginal benefits to David's being "mainstreamed" at Lewis & Clark for such things as lunch, OPS cannot provide an all-signing environment. There is no question but that OPS could not turn any of its schools into an all-signing environment, so the issue is not whether OPS can feasibly provide those services in a regular school, but rather whether the mainstreaming benefits are outweighed by the all-signing environment at NSD.

If I assume that David would receive some marginal benefit from "mainstreaming," and I am compelled by *Roncker* to determine whether that marginal benefit is outweighed by the benefits gained from an all-signing environment, it is important to identify what benefit it is claimed would accrue to David by virtue of mainstreaming. The benefits from placement in a regular school which are being claimed on behalf of David are increased opportunities to communicate in a variety of ways, particularly with hearing peers. In other words, Mr. French believes that David would be stimulated to use a variety of communication methods if he were forced to deal with hearing children at a regular school and, thus, his general ability to communicate would be enhanced. Assuming for the purposes of argument that Mr. French is correct, I will briefly attempt to evaluate the significance of this benefit in relation to the benefit of an all-signing environment which would accrue to David at NSD.

It is proposed that David would have opportunities to interact with hearing children during lunch, during gym class, passing in the hallways, and at assemblies and all-school functions. If David were to meet an age-appropriate hearing peer in the hall-

way or during lunch, for example, what would be the educational significance of this opportunity for communication?

I begin with the understanding that David does not like to initiate communication and when he does initiate communication, he prefers that it be with adults rather than with his peers. It is likely, therefore, that David's shyness in communicating with peers would detract from the significance of the opportunity for communication. Assuming that David wished to initiate communication with a hearing peer, or that a hearing peer wished to communicate with David, what would be the level of that communication be? In some ways, the communication would be as if it were between a kindergarten or first grade child, five to seven years of age, and a seventh or eighth grade child, approximately thirteen or fourteen years old.

The language gap is so vast it is difficult to conceive that anything of value would take place. The communication would likely be short, seldom involving any real dialogue, and because of the language gap, probably frustrating for both David and the hearing child. Of course, all of this assumes that David would be communicating either in writing or by means of some other augmentative communication device such as a book of phrases hung about his neck or some sort of computer-like device.

Assuming that either David or one of his hearing peers would initiate conversation and that the language gap between David and the other child is not an insurmountable barrier, David's need to utilize augmentative communication devices would make the conversation extremely slow. David would either have to write, point to a

implement the "mainstreaming" preference of the EHA. For example, the director of special education for OPS testified that OPS currently educates approximately 193 hearing-impaired students of different degrees. OPS has three categories of instruction. The first category of instruction is instruction in the regular classroom with resource help such as interpreters. The second category of instruction is the utilization of a self-contained hearing-impaired classroom, with some part of the academic program taking place in a regular classroom with the aid

of interpreters and the like. In the third category of instruction the majority of instruction takes place in the hearing-impaired classroom but there is limited participation in nonacademic areas outside the hearing-impaired classroom. Thus, it appears that OPS has no objection to the general concept of a hearing-impaired classroom for academic subjects with limited participation in nonacademics in a "mainstream setting," provided there is benefit to the student and it is feasible for OPS to provide such services.

phrase in his book, or type out some sort of digital message. The hearing child would have to respond by gesture, writing, or utilizing David's computer-like device.

Still further, because of his physical disabilities, David would need extra time to pass in the hallway or simply move from one spot to another.[18] I do not foresee incidental social discourse taking place in the hallway or lunchroom as I visualize a child reluctant to communicate with his peers in the first place, having no equivalent fund of language with which to communicate with his peers, forced to rely upon communication devices which are slow and which produce essentially simplistic messages, who would often be preoccupied with the physically laborious task of ambulating from one point to another.

In terms of experiences at assemblies and the like, one could anticipate that much of what would take place would be beyond David's ability to comprehend due to his language gap. Convocations would obviously be geared toward the language ability of an average junior high school student, whereas David's language ability is that of a kindergarten or first grade child. Moreover, the use of an interpreter during a convocation would be problematical for David since in most situations he does not attend well with an interpreter.

David's participation in the gymnasium would be limited because of his physical handicaps. Certainly he could not participate in many of the sports that hearing peers might be expected to be involved in during physical education classes.

Mr. French currently transports David to and from school because David requires the use of a special seat for protection from forceful forward motion in an automobile even though NSD has offered to provide transportation for David with use of such a seat. Thus, it is not likely that David would have much of an opportunity to engage in conversations with hearing students while being transported to and from school.

In summary, the marginal benefits to David which would accrue from mainstreaming in nonacademic activities would be quite limited. I must therefore examine the claimed benefit of an all-signing environment.

The all-signing environment available at NSD gives David a constant opportunity to exercise his primary method of communication—sign language. In virtually every case—with teachers, with the school nurse, with the school dietician, with his fellow students, including at least one age-appropriate peer having a similar level of language ability, with janitors, and the like—David is forced to use his primary language tools at NSD.

This preference for the all-signing environment at NSD is not based on an assumption by OPS that all deaf children should be taught at deaf schools. Rather, it is based upon the belief that David requires constant exercise in the use of sign language in order to overcome a unique and drastic language delay. As Ms. Hopkins testified for OPS, David, unlike other deaf children, had essentially no basic language development until he was adopted:

THE COURT: Thank you.

Let me change the focus, and this question may or may not prompt an answer which is similar to the one that you've already given me. At Lewis & Clark and other schools at OPS, there are numerous hearing-disabled children. I'd like you to tell me, as best you can, in lay terms, what it is about David that distinguishes him from other hearing-impaired children.

A. David has many handicaps. He has visual impairment, hearing impairment, physical handicaps, and he was delayed severely in the ages of zero to five, or zero to four, whatever it was

18. I do not agree, however, that David is so fragile that his placement at Lewis & Clark is precluded for medical reasons. None of David's doctors feared placement of David at a regular school. Slight accommodations, such as extra time to pass in the halls, could be made for David's medical problems. The court had much more evidence on the medical issues than did the hearing officer, and thus the hearing officer's concerns about David's medical problems are, I think, a result of an inadequate record.

before he was adopted, so he really didn't have the basic language development that children have and our—many of our students are identified very early and are given sign language and given language at birth or very soon after when they're identified as deaf, and go to preschool, have parent/infant programs, toddler programs, preschool programs and the language is developed in them as rapidly as they can so their delay is not as drastic as it is in David. For example, when David, it was said, was five years old, I believe, he had four words, and a normal child at that age has 2,000 words. I mean, we're looking at a real severe delay and he's always going to be catching up, and you compound that with all of the other handicaps that he had.

Q. Would it be fair to say that it's your opinion that his language delay, however, is by far and away the most significant disability in terms of his—in terms of educational concerns?

A. That's correct.

Q. One last question. Can you rank David in terms of the severity of that educational disability with other hearing-disabled children that you've been responsible for in the OPS system in terms of the degree of severity?

A. He is the most severe. I don't know how I would rank it, but I would say he's very unique, and I have never seen a child that has been so language-delayed at his chronological age.

Partial Transcript of Testimony of Paula Hopkins; TR 126: 23–25; 127: 1–25; 128: 1–16.

OPS believes that if David is ever to begin to catch up in terms of his language deficiency his primary method of communication must be the focal point of his instruction. An all-signing environment obviously stresses to the maximum extent possible the use of sign language and thus the acquisition of greater language skills. In this sense, David is likely to have more varied academic and practical opportunities to fill in his language gap if he is confronted with an all-signing environment. Ms. Hopkins testified for OPS as to the edu-

cational significance of an all-signing environment this way:

Q. Now, I want to turn your attention to the Nebraska School for the Deaf and compare that to Lewis & Clark for a moment. What is it that David, in your opinion, presently gets at the Nebraska School for the Deaf that is not generally available to him at Lewis & Clark which is educationally significant to you?

A. Several things. The most important is that he has numerous signing instructors who are giving him strict instruction in sign language where there's not going to be an interpreter, a third party involved, and that gives him the ability to communicate with numerous different people in sign language, which will, hopefully, develop that language ability that we've been kind of circling on. Nebraska School for the Deaf can give him one-to-one instruction that he needs most of his day, and they do have peers that have a low language level that they could group him with and make that arrangement possible.

Q. When you speak of peers now, you're speaking of peers in chronological age:

A. Correct.

Q. I interrupted you.

A. That's okay.

Q. Pardon me.

A. At Nebraska School for the Deaf, they have the special dietary situations, they can create functional, social things in their classrooms that's capable within their realm, where in the junior high setting, it would be done only because he's alone.

Partial Transcript of Testimony of Paula Hopkins; TR 125: 16–25; 126: 1–22.

In sum, what David receives at NSD, and cannot receive at a regular OPS school, is an all-signing environment. In the opinion of OPS, this is valuable to David not just because he is deaf, but, much more importantly, because he has so far to go, given his early lack of language development, to begin to learn the rudiments of language. I believe the record supports OPS's conclusion by the preponderance of the evidence

that any marginal benefits received from mainstreaming are far outweighed by the benefits gained from the services which could not feasibly be delivered other than at NSD.

### B.

■ The hearing officer concluded that the 1989–90 IEP was deficient in terms of (a) failing to provide a "statement of the present levels of educational performance of such child," and (b) failing to state "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved," within the meaning of 20 U.S.C. § 1401(a)(19)(A) & (E).

The hearing officer concluded that the 1989–90 IEP did not comport with 20 U.S.C. § 1401(a)(19)(A) because it contained "outdated, incorrect and unreliable information relating to David's current level of educational performance" (Exhibit 13, at 122). In this regard, the hearing officer gave two examples of what he thought was deficient:

Dr. Susan Rose testified regarding her concern that the Current IEP contained no baseline data: starting points from which to measure David's progress. For example, the Science category, with the exception of the Woodcock–Johnson score, is blank (Exhibit 2, Tab U, Page 6). Although at Como, his science and social studies curriculum was intertwined (Exhibit 1, Tab Y, Page 1), and David's 1988–89 IEP listed certain science objectives (Exhibit 1, Tab DD, Page 6).

The Math category is the most easily understood. It indicates what David can do, and what he has trouble with. Interestingly, the Current IEP indicates that David cannot count money or change, (Exhibit 2, Tab U, Page 11). This is in direct conflict with the information provided by Como (Exhibit 1, Tab D, Page 22), indicating that David knew the value of coins, and was able to add them up to $2.00.

Exhibit 13, at 122.

With due regard for the opinion of the hearing officer, I simply do not understand how the IEP is deficient in failing to state David's current level of educational performance. Following is the description of David's level of educational performance in that IEP:

Present Level of Performance:
    Psychological Testing—BTNI 2/89
    Wisc–R Minimum performance Score = 81
    Low on picture arrangement
    Deficits in understanding social relationships and consequences
    Hiskey—Dev. IQ = 88–96

General Information Levels: (BTNI 2/89)
    Woodcock–Johnson Psych.—Educational Battery BTNI 2/89

| | | |
|---|---|---|
| Humanities rank @ gr.2 | 1.08 gr. eq. | 3yr 10mo age eq. 1% |
| General Knowledge | 1.4 gr. eq. | 6yr 9mo below norm |
| Kaufman Test of Educational Achievement 2/89 BTNI | | |
| Battery Composite gr.2 | 2.3 gr. eq. | 7yr 9mo age eq. 1% for |

OBSERVATIONAL DATA

Testing/instruction requires 2× normal administration time.

Effort reduced when presented with difficult task or high language level.

Poor attention to directions whether presented in written or sign form. Necessary to repeat directions and questions several times for response. Able to follow one/two step directions.

Difficulty with new and unfamiliar language

Limited social skill interaction

Does not use conversation maintenance or turntaking strategies in communication

Good visual memory
Able to remember written information

Instruction must be adapted for his understanding based on adult's awareness. David does not express his misunderstanding or lack of knowledge.

Necessary for instruction given in one to one situation

Requires highly structured situation with guidelines and realistic expectations

Persistence to task—strength

Expresses need to be correct and precise with all work

Sign Language skill level: Expressive signs are telegraphic with some 3 word correct syntax.

Intelligibility of signs by adults in speech class—15%
in Lunch by supervisor— 5%

Unresponsive to communication initiated by others:
Responsive 1 out of 10 trials

Turns hearing aids off during instructions: 2–3 times daily

## COMMUNICATION

Uses ASL signs in English word order

Rarely initiates communication (BTNI 2/89)

Communication strategies based on shared knowledge and has difficulty generalizing to other topics (experiences/maps) (BTNI 2/89)

Can request, answer, acknowledge (head nod) and describe functions present when at his vocabulary and language level (BTNI 2/89)

Has manuscript and cursive writing skills. Manuscript at slow speed. Cursive letters are formed and produced correctly.

Computer skills/Keyboarding skills—presently does not know locations of keys. Has good memory for development of keyboarding. Finger dexterity and motor movement creates limitations (ability statement to use computer at present).

Speech production skills are below 3 year level.

Responses limited to sign, written word, short phrase (BTNI 2/89)

Lipreading skills: Craig Lipreading Inventory 9/11/89
  Picture matched to word—50% correct
  Sentence recognition—$\frac{1}{6}$ correct
  (student did not attend to speaker for sentence)

Listening skills: Environmental awareness (DLM tapes) $\frac{6}{10}$, $\frac{8}{10}$, $\frac{5}{6}$, $\frac{7}{8}$, $\frac{2}{5}$, $\frac{2}{5}$ correct

## LANGUAGE

5–6 yr age equivalent
1–2 grade equivalent / 1st% / Language competence (BTNI 2/6/89)

Beginning 1st grade Woodcock–Johnson Knowledge subtest (concept dev.)

Vocabulary = 5yr 6mo Woodcock–Johnson (BTNI 2/89)

Analogies = 6yr 7mo Woodcock–Johnson (BTNI 2/89)

Antonyms/Synonyms = 8yr Woodcock–Johnson (BTNI 2/89)

Concept Dev. = 3rd% for 2nd grade—Boehm Test (BTNI 2/89)

Mean Length of Utterance—4.58 (BTNI 2/89)

Uses basic SV, SVO or SVC sentence structure (BTNI 2/89)

Can answer simple concrete questions (BTNI 2/89)

Understands use of present and future tense verbing

Cannot recognize and correct sentence fragments

READING

| | | |
|---|---|---|
| Word Reading | 1.7 grade equivalent | 9% for 2nd grade |

Stanford Achievement Test—HI Primary 2, Form E (BTNI 2/89)

Kaufman Test of Educational Achievement (BTNI 2/89)

| | | |
|---|---|---|
| Reading Decoding  1.7 gr. eq. | 4th% | 7yr 0mo age eq. |
| Reading Comprehension  1.7 gr. eq. | 5th% | 6yr 9mo age eq. |
| Reading Composite  [sic] 1.7 gr. eq. | 3rd% | 6yr 9mo age qu. |

Sight word reader
Uses no decoding skills
Uses lead letter strategy
Uses rote memory for decoding strategy (BTNI 2/89)

Reading comprehension demonstrated with reduced vocabulary, reduced length and reduced language complexity (BTNI 2/89)

Reading comprehension limited to key words and concepts (BTNI 2/89)

Does not generalize information to understanding of whole (BTNI 2/89)

Requires additional visual information for Reading comprehension (pictures, diagrams, experience, etc.) (BTNI 2/89)

Comprehension of paragraph level limited.  Cannot identify main idea (BTNI 2/89)

Can use primary level dictionary and the glossary of a book, continues to need prompts to utilize these stragegies/ [sic] not at independent level.

Not able to retell or rephrase story he has read

Not able to draw conclusion or state predictions from reading material

MATHEMATICS

Kaufman Test of Educational Achievement BTNI 2/89

| | | |
|---|---|---|
| Math Application  2.2 gr. eq. | 2% rank | 7yr 6mo age eq. |
| Math Computation  3.9 gr. eq. | 6% rank | 9yr 6mo age eq. |
| Math Composite  3.1 gr. eq. | 2% rank | 8yr 6mo age eq. |

Has ability to add and subtract three to five digit numbers

Understands number place values of ones, tens, hundreds, thousands

Can add and subtract decimals 100% accuracy

Can add and subtract fractions of the same denominator

Can multiply three-digit number by a two digit number

Can divide with single digit number (divisor) with assistance

Unable to count money or count change

Unable to break down language and decipher appropriate math application to do math story problems

SCIENCE

Woodcock–Johnson Psycho–Educational Battery BTNI 2/89

| | | | |
|---|---|---|---|
| Science  gr. 2 | 1.01 gr. eq. | 4yr 0mo age eq. | 1% rank @ |

SOCIAL STUDIES

Woodcock–Johnson Psycho–Educational Battery BTNI 2/89

| | | |
|---|---|---|
| Social Studies  1% rank @ gr. 2 | 1.029 Gr. eq. | 4yr 9mo age eq. |

Demonstrates understanding of map skills:  knows states, minimal use of map keys, uses road maps well

OCCUPATIONAL THERAPY

Student is unable to produce pattern on a loom, a usable belt, and a water color painting, and is unable to assemble materials and clean up materials associated with these tasks.

Student unable to fasten buttons and zippers (unless velcro closure)

Student requires set up and stand by assistance at times for computer usage

Student presently types using only the index finger and is unable to type with both hands on the keyboard

PHYSICAL THERAPY

Joint measurement readings as of April 89 were as follows:

| | |
|---|---|
| Shoulder flexion | 85′ right, 95′ left |
| Shoulder abduction | 80′ right, 90′ left |
| Shoulder internal rotation | 10′ right, 15′ left |
| Elbow flexion-extension | 50′ to 130′ right |
| | 55′ to 115′ left |
| Wrist extension | 25′ right, 25′ left |
| Hip flexion-extension | 25′ to 105′ right |
| | 15′ to 100′ left |
| Hip abduction | 30′ right, 15′ left |
| Straight leg raise | 90′ right, 85′ left |
| Knee extension-flexion | 25′ to 85′ right |
| | 15′ to 35′ left |

Because of his physical limitations, David is unable to participate in a regular physical education program

David is unable to get on or off the school van without being lifted

David can presently do 10 repetitions of designated muscle strengthening exercises for neck flexors, hip extensors and left hip external rotators

David requires the use of special equipment and orthotics to facilitate access to his educational environment.

Student does not have his Webelos Athlete Badge.

Exhibit 2, Tab U at 8–12.

---

Question 36 to Appendix C of the EHA regulations explains what is expected in an IEP in terms of a child's present level of educational performance:

*36. What should be included in the statement of the child's present levels of educational performance?*

The statement of present levels of educational performance will be different for each handicapped child. Thus, determinations about the content of the statement for an individual child are matters that are left to the discretion of participants in the IEP meetings. However, the following are some points which should be taken into account in writing this part of the IEP.

a. The statement should accurately describe the effect of the child's handicap on the child's performance in any area of education that is affected, including (1) academic areas (reading, math, communication, etc.), and (2) non-academic areas (daily life activities, mobility, etc.).

NOTE: Labels such as *mentally retarded* or *deaf* may not be used as a substitute for the description of present levels of educational performance.) [*sic*]

b. The statement should be written in objective measurable terms, to the extent possible. Data from the child's evaluation would be a good source of such information. Test scores that are pertinent to the child's diagnosis might be included, where appropriate. However, the scores should be (1) self-explanatory (i.e., they can be interpreted by all participants without the use of test manuals or

other aids), or (2) an explanation should be included. Whatever test results are used should reflect the impact of the handicap on the child's performance. Thus, raw scores would not usually be sufficient.

c. There should be a direct relationship between the present levels of educational performance and the other components of the IEP. Thus, if the statement describes a problem with the child's reading level and points to a deficiency in a specific reading skill, this problem should be addressed under both (1) goals and objectives, and (2) specific special education and related services to provided to the child.

34 C.F.R. Part 300, Appendix C, Question 36, at 87–88 (1990).

According to Paula Hopkins, who supervised preparation of the IEP for OPS, Mr. French did not challenge the statement of David's present level of performance. It was her "understanding at those meetings that he agreed to these present level[s] [of] performance" (Partial Transcript of Testimony of Paula Hopkins; TR 64: 5–6). Moreover, Ms. Hopkins testified at trial that to the best of her knowledge there was nothing incorrect in the IEP's statement of David's present level of performance. Consequently, I do not understand the hearing officer's conclusions in this regard. As I understand it, the hearing officer gave two examples of what he was concerned about.

He first said, "[F]or example, the Science category, with the exception of the Woodcock–Johnson score, is blank ..." (Exhibit 2, Tab U at 11). When one examines the science portion of the IEP, however, the exception which the hearing officer found to be insignificant is, in my opinion, quite significant. The IEP describes that David is at the 1.01 grade equivalency level in science, at four years and zero months age equivalency level in science, and in the first percentile in science for students in grade two (Exhibit 2, Tab U at 11). Here the level of David's performance in science is "written in objective measurable terms, to the extent possible," and the test scores are self-explanatory, meaning that they "can be interpreted by all participants without the use of test manuals or other aids," in accordance with Appendix C to the EHA regulations. Therefore, I fail to understand how this information is "outdated, incorrect and unreliable" as suggested by the hearing officer (Exhibit 13, at 122).

Insofar as math is concerned, the hearing officer also offered an example of what he apparently thought was an error in the IEP's statement concerning David's present level of performance. The hearing officer observed that the "IEP indicates that David cannot count money or change ... [but] [t]his is in direct conflict with the information provided by Como ... indicating that David knew the value of coins, and was able to add them up to $2.00" (Exhibit 13, at 122). Once again, I do not understand this criticism. It may well have been true that at one time David could add "up to $2.00 in coins." However, there is no evidence in the record to suggest that the IEP's conclusion that David was then unable to "count money or change" is in error.[19] It is entirely possible that David may have regressed in terms of his ability to count money or change. Absent some indication in the record that the IEP's statement is factually incorrect, and that this factual error had significant bearing upon David's programming needs, I can find no basis upon which to fault the IEP's analysis of David's present level of performance regarding mathematics.

In summary, the four pages of information endeavoring to describe David's present level of performance were based not only on testing conducted by BTNI, but also on detailed, objective observations documented by David's teachers as recently as the day before the IEP meeting on September 29, 1989. Nowhere does the hearing officer describe how the IEP is deficient in terms of present levels of performance in relation to Appendix C to the EHA regula-

---

**19.** This problem may simply be one of semantics. The most recent IEP, which is not challenged, states that: "When asked for money amount, he can count change and dollars [but] [w]hen asked to give change from money amount he can not" (Exhibit 101 at 5).

tions regarding statements of present levels of performance. 34 C.F.R. Part 300, Appendix C, Question 36, at 87–88 (1990). Moreover, and this is extremely important, Mr. French did not object to the IEP's statement of David's present level of performance. As Appendix C suggests, "determinations about the content of the statement for an individual child are matters that are left to the discretion of participants in the IEP meeting." Id. Mr. French's failure to raise any objections regarding the statement of David's present level of performance strongly suggests that the parties exercised their discretion, as contemplated by the regulations, and came to the conclusion that the four-page statement of David's present level of performance was an adequate summary of the BTNI evaluation, the observations of David's teachers, Mr. French's observations, and other data available to the IEP participants.

The hearing officer also found that the 1989–90 IEP was deficient because it lacked "appropriate objective criteria, evaluation procedures and schedules for determining achievement of educational objectives" (Exhibit 13, at 129). The hearing officer thus found that the IEP failed to comply with the provisions of 20 U.S.C. § 1401(a)(19)(E) requiring "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." The hearing officer's criticism with regard to this issue is also unclear. Apparently, the hearing officer believed the IEP failed to "stress life skills and practical knowledge rather than the abstract and technical" (Exhibit 13, at 123).

Once again, Mr. French did not object to the objectives, evaluation procedures, and schedules implemented by the IEP. Paula Hopkins testified at trial without contradiction on this point:

Q. Again, directing your attention to the meetings on September 21 and 29 of 1989, did Mr. French voice any concerns about the evaluation procedures shown in the IEP, which is there in tab U of Exhibit 2?

A. No.

Q. Did Mr. French at the meetings of September 21 and 29, 1989, to your recollection, voice any concerns about the schedules shown in that IEP in Exhibit 2, tab U?

A. No.

Partial Transcript of Testimony of Paula Hopkins; TR 66: 3–13.

Appendix C to the EHA regulations provides that IEP objectives require somewhat less detail than daily instructional plans, and are intended to provide general bench marks for determining progress toward meeting annual goals. 34 C.F.R. Part 300, Appendix C, Question 39, at 88 (1990). Thus, instructional objectives are intended as "intermediate steps between a handicapped child's present level of educational performance and the annual goals that are established for the child." Id. These objectives should "describe what a given child is expected to accomplish in a particular area within some specified time period" and provide mechanisms to "determine the extent to which the child is progressing toward those accomplishments." Id.

The hearing officer's apparent objection to this portion of the IEP is that it fails to "stress life skills and practical knowledge rather than the abstract and technical" (Exhibit 13, at 123). Other than this abbreviated generalized statement, the hearing officer failed to provide any particulars to illustrate his criticism. I have carefully reviewed the more than eighty objectives set forth in the IEP and I must conclude that the hearing officer's objections are simply in error as a matter of fact.

The objectives section of the IEP includes a wide variety of more than eighty objectives. Seven of those objectives are labeled "pragmatics," (Exhibit 2, Tab U at 29–32), involving, for example, a series of role-playing events in one set of pragmatics, utilizing six language functions, such as making a request, as another pragmatic function, and identifying phrases and sentences auditorially so as to use a hearing aid. Another set of pragmatics attempts to force David to correctly identify appropri-

ate social responses. Still another set of pragmatics attempts to assist David to learn to work in a timed environment. Another set attempts to stress learning by scanning written or visual information. The final set of pragmatics, proposed by Mr. French, suggests using a TDD to carry on a five-minute telephone conversation.

For the other objectives, there are numerous practical and active learning tasks. In the area of computers, for example, David was to be taught to load and run a computer program in one set of objectives and in another set of objectives he was to use a word processor to write a story, increasing in complexity over time, based on his life experiences and interests (Exhibit 2, Tab U at 18). In another set of objectives regarding "auditory training," David would be asked to identify sounds presented in his environment (Exhibit 2, Tab U at 37–38).

While there is certainly an emphasis on academics, it is not fair to say that the IEP stresses abstract and technical learning over life skills and practical knowledge.

In summary, the hearing officer's conclusion that the IEP failed to adequately state David's present level of performance and failed to adequately state instructional objectives is not supported as a matter of fact. Rather, by reference to the appropriate federal regulations, it seems evident that the IEP fully complies with the regulations.

Significantly, Mr. French did not object to the IEP, except in terms of its placement decision. His failure to object suggests that the IEP fully complied with what Congress expected. "The congressional emphasis upon full participation of concerned parties throughout the development of the IEP ... demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in

an IEP." *Rowley*, 458 U.S. at 206. The preponderance of the evidence establishes that the IEP fully complied with the EHA.

## IV. CONCLUSION

I find by the preponderance of the evidence that judgment should be entered in favor of the defendants, on the merits,[20] and against the plaintiff. The Clerk of the United States District Court for the District of Nebraska is hereby directed to enter judgment in favor of the defendants, and against the plaintiff, dismissing this case.

---

**20.** Having resolved this case on the merits, I need not determine whether evidence received either at the administrative hearing or during trial of this case is admissible against NDE. I have assumed for purposes of resolving this case on the merits that the evidence is admissible against NDE. Moreover, because I have resolved this case on the merits, I need not determine whether or not NSD or NDE are proper parties or whether such defendants would have Eleventh Amendment immunity.